**Debbie Tucker LOVELESS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 6–89–121–CR.**

Court of Appeals of Texas,
Texarkana.

Dec. 4, 1990.

Charles M. Cobb, Mount Pleasant, for appellant.

Frank Long, Dist. Atty., Sulphur Springs, for appellee.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

CORNELIUS, Chief Justice.

Debbie Tucker Loveless was convicted of murder and sentenced to life imprisonment. On appeal she contends there was insufficient evidence to support the jury verdict and that the trial court erred in refusing to grant her motion for a separate trial, in allowing prosecutorial misconduct, in failing to declare a mistrial when the prosecutor commented on her failure to testify, and in allowing hearsay evidence. We overrule all these contentions and affirm the judgment.

The emergency medical service team of Emory, Texas, received a call at about 12:34 p.m. on January 4, 1989, concerning a severely injured child. The paramedics were summoned to the home of Loveless. When they arrived, they were met by Loveless and the co-defendant, John Harvey Miller. April Tucker, Loveless' four-year-old daughter, was lying on the floor in the kitchen, wrapped in a blanket. April's naked body was completely covered with multiple abrasions, bruises and puncture wounds. There was also a gaping wound in her right inner thigh. When the paramedics inquired about April's injuries, Loveless and Miller told them that April had been attacked by dogs after she had fallen off or onto a fence. The paramedics rushed April to the Emory fairgrounds, where they were met by a helicopter paramedic team which transported April to the hospital in Tyler. Loveless went with the paramedics in the ambulance to meet the helicopter. Miller said he would meet Loveless there. He said he needed to "pin (sic) up the dogs."

The examining doctor testified that when April got to the hospital she was "essentially morbid." She was hypothermic and sections of her femoral artery and vein had been severed and were completely absent from the gaping wound in her leg. After her vital signs were somewhat stabilized, April was taken to the operating room for corrective surgery of her leg wound. The doctors were able to restore circulation to her leg by doing some bypass procedures around the damaged vessels. However, April's overall condition was too severe. She died during surgery.

The doctor who performed the surgery testified that in his opinion April's injuries were not the result of a dog or any kind of animal attack. He testified that by the time April arrived in the emergency room she had lost nearly five pints of blood. A healthy girl her size and age would normally have about six pints of blood in her body. The doctor also stated that an injury to the femoral artery and vein would immediately result in a large amount of blood loss at the scene of the injury.

The paramedics who initially treated April at the Loveless residence notified the Rains County sheriff's department of April's injuries and the alleged dog attack. The sheriff and one of his deputies met the paramedics at the home of Loveless about 4:00 p.m. on January 4, 1989. When they pulled up in the driveway, they saw two small dogs and a puppy in the back yard running loose. The dogs were friendly, and there were no dogs penned up. Sheriff's officers conducted a brief search around the residence and recovered a child's sweatshirt and a small sock. The items were found near a small barn behind the residence. The sheriff's officers continued to examine the area, but did not find any sign of a struggle or scuffle.

Later that evening, the sheriff received a call from a Tyler judge who informed him that April had died and that an investigation into her death should commence. The sheriff and his deputies returned to Loveless' home around 9:30 p.m. the same evening. Loveless and Miller returned from Tyler to their home while the sheriff's officers were conducting the second search of the area. Miller led the sheriff and his deputies to the spot where he said he found April. The authorities examined the area. They found a few small blood spots on several leaves that were on the ground near the spot where April was allegedly found by Loveless and Miller, but there was not a sufficient amount of blood to analyze.

Both Loveless and Miller gave voluntary statements to the sheriff's officers. In her statement, Loveless said she had breakfast with April at about 9:00 a.m. on the morning of January 4, 1989. She stated that she and April watched television for a while, and then around 10:00 a.m., April told Loveless that she was going outside to see what her "daddy" was doing. Loveless then stated that she called for April about 10:30 a.m.; that about 10:40 a.m., April returned to the house and drank a glass of Kool–Aid; and at about 11:00 a.m., April went back outside. Loveless stated that at around 11:15 a.m., she went to an area behind her residence where Miller was tearing down an old house. She said that she called out for April (who was allegedly out in the field playing with the dogs) and told her to come back to the house, and April responded. Loveless stated that she worked with Miller for about fifteen minutes and then at about 11:30 a.m., she called for April again, and April again responded. Loveless said that at about 11:45 a.m. she called for April a third time, but on this occasion April did not respond. Loveless stated that she and Miller then went to look for April. She said they noticed their three dogs coming toward them from the direction April had been. The dogs then turned and headed back up the hill as if they were trying to lead Loveless and Miller to April. Loveless said that she and Miller found April face down next to a fence. Loveless said she screamed, "My God, there she is, she don't have any clothes on." Loveless said April was covered with scrapes and bruises and had a "cut" or "gash" in her upper leg. Loveless said she ran back to the house, got her keys, and then drove to a neighbor's house to call an ambulance. When she returned to her house, April was on the kitchen floor. Loveless stated that Miller had wrapped April's jeans around her legs to stop the bleeding and had a wash rag over the cut in her leg. Loveless stated that she then wrapped April in a blanket to keep her warm. The ambulance arrived a short time later.

In his statement to the sheriff's department, Miller stated that after he had sent

Loveless for an ambulance, he took off April's jeans and panties (which were allegedly down around her left ankle) and wrapped the jeans around her hips and put the panties over the gash in her leg. He stated that he took off his shirt and wrapped it around April. He also stated that as he was carrying April back to the house, he noticed April's blue coat on the ground. He said he stopped and wrapped April in the coat and then ran for the house.

During the sheriff's second visit to the Loveless residence, Miller showed one of the deputy sheriffs the clothes April was wearing that day. They were hanging in the bathroom. They consisted of a blue and white jacket, a pair of blue jeans, child's panties, one red shoe, and a sock. Miller also showed the authorities the shirt he was wearing that day which he said he wrapped around April. Neither the shirt nor the other pieces of clothing were submitted to a lab for blood analysis because they either had no blood stains on them or an insufficient amount to analyze.

The sheriff's officers returned to the Loveless residence on January 7, 1989, and conducted a third search. No wild animals were found in the area. Officers searched Loveless' home and found a curling iron under some clothes in a clothes hamper in the bathroom. This particular search did not uncover a knife the authorities were looking for; however, when asked about such a knife, Loveless told the authorities that she and Miller had a knife that they kept under the passenger side of the front seat of their vehicle. She retrieved the knife and gave it to the authorities. Both the curling iron and the knife were taken to Dr. Gonzales in Tyler.

Dr. V.V. Gonzales, the medical examiner for Smith County, conducted an autopsy on April's body on January 5, 1989. He testified that he had examined humans attacked by animals (i.e., dogs, alligators and snakes) before. He stated that the multitude of abrasions, bruises, and lacerations that covered April's body were not inflicted by an animal, but were inflicted by a human being. Dr. Gonzales stated that, because of the pattern of April's injuries, the curling iron was most likely used to inflict the multiple abrasions, bruises, and puncture wounds covering her body. The curling iron contained plastic prongs or "teeth" on the sides of the elongated brush, and some of the teeth were broken. The doctor further testified that the pattern of the cuts and scratches on April's body matched the configuration of the teeth on the curling iron, including the missing prongs. He stated that the large gaping wound in April's thigh was caused by a sharp object such as a knife, not unlike the knife recovered from Loveless. Moreover, he stated that the numerous slicing wounds found around the edges of April's thigh injury were "hesitation wounds"[1] consistent in depth and width with the knife recovered from Loveless. The doctor stated that all of April's injuries were inflicted some two to three hours prior to the time that paramedics first arrived at the Loveless residence.

Dr. Gonzales also stated that he went to the scene where April was allegedly found and examined the fence she reportedly fell from. He found no blood and no flesh. He found no sharp object on or around the chain link fence. The doctor stated that, given the extent of April's injuries, especially the thigh wound, there should have been a tremendous amount of blood all over the area where April was allegedly found, as well as covering her body. Since only traces of blood were found in the area, the doctor stated that April could not have been injured where Loveless and Miller allegedly found her.

Dr. Gonzales also commented on the items of clothing that were entered into evidence. He stated that the lack of blood

---

1. Hesitation wounds were described as wounds where one deliberately will "stab, slice, pull it back, slice, pull it back," and which are done in order to prevent a lot of bleeding while the injuries are being inflicted.

on any of the items of clothing indicates that April was naked when her injuries were inflicted.

Before the State closed its case against Loveless and co-defendant Miller, Loveless' neighbor, Lanell Northcutt, was called to the witness stand. Northcutt testified that she drove Loveless and Miller to Tyler after April was airlifted to the hospital. She stated that during the trip to the hospital Loveless and Miller told her what they had been doing before they found April. They told her that they had been tearing down an old house behind their residence. Loveless told Northcutt that she had put a blanket out back for April to play on. Loveless told Northcutt that April was with them throughout the morning while she and Miller worked on the house.

Loveless' initial point of error challenges the sufficiency of the evidence to support the jury's verdict. She contends that the entire record in this case can be read and reviewed without discovery of any evidence that she was guilty of any act or omission which in any way contributed to the injury or death of April Tucker.

The State based its case on circumstantial evidence. Its theory was that Miller and/or Loveless had beaten April almost to death, and had inflicted the gaping wound in her thigh to make it appear that she had been attacked by dogs and dragged over or off the chain link fence.

■■■ The standard for reviewing the sufficiency of the evidence on appeal is the same for direct and circumstantial evidence cases. *Alexander v. State,* 740 S.W.2d 749 (Tex.Crim.App.1987). The critical inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Butler v. State,* 769 S.W.2d 234 (Tex.Crim.App.1989). In circumstantial evidence cases, it is not necessary that every fact point directly and independently to the

defendant's guilt. It is enough that the conclusion of guilt is warranted by the combined and cumulative force of all the incriminating circumstances. *Livingston v. State,* 739 S.W.2d 311 (Tex.Crim.App. 1987), *cert. denied,* 487 U.S. 1210, 108 S.Ct. 2858, 101 L.Ed.2d 895 (1988). However, a conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except that of the defendant's guilt; that is, if the evidence supports a reasonable inference other than the defendant's guilt, a finding of guilt beyond a reasonable doubt is not rational. *Carlsen v. State,* 654 S.W.2d 444 (Tex.Crim.App.1983).

■■ There is a tremendous amount of evidence in this case. It has been summarized above, but not all of the details have been recited. Each detail is important as it contributes to the cumulative force of the evidence. Summarizing only the most important facts, the evidence shows that April lived with Loveless and co-defendant Miller and they were the only ones who had possession of her before her injuries. There is no evidence of any struggle at the scene where they said April was found; no sharp objects were found in the area; there was no trace, other than a few drops of blood, of the four to five pints of blood April apparently lost because of her injuries. There were no blood stains on any of the items of clothing that April reportedly wore the morning of January 4, 1989. Most importantly, the record shows that Loveless and Miller changed their stories several times when asked about the events surrounding April's injuries.

Both the doctor who treated April at the hospital and the medical examiner testified that April's injuries were not inflicted by animals. The medical examiner stated that April's injuries were inflicted two to three hours before the paramedics arrived at the Loveless residence. That indicates that April sustained her injuries at about 10:00 the morning of January 4, 1989. This is inconsistent with Loveless' statement to the authorities that she saw April through-

out the morning and knew of her whereabouts until about 11:45 a.m. The medical examiner testified that in his opinion the multitude of abrasions, bruises, and puncture wounds found on April's body were caused by the curling iron found in the bottom of a hamper under some clothes in the bathroom of the Loveless residence. The medical examiner further testified that the leg wound was inflicted with a knife of the same type as the one that was recovered from Loveless. He also stated that the several slices or hesitation wounds around the gaping thigh injury were consistent in depth and width with the knife recovered from Loveless. There was also evidence that although Loveless and Miller told the authorities that the knife was new and had not been used, an analysis of the knife revealed some blood stains on it.

Although not all of the evidence points directly and independently to Loveless' guilt, the combined and cumulative force of all the incriminating circumstances warrants the conclusion of guilt. *Livingston v. State, supra.* No reasonable hypothesis is presented by the evidence that even suggests that someone other than Loveless and Miller committed the offense. *Alexander v. State, supra; Carlsen v. State, supra.* The jury was charged on the law of parties, and in viewing the evidence in the light most favorable to the prosecution, we conclude that a rational trier of fact could have found beyond a reasonable doubt that Loveless, as a party, committed the charged offense.

Loveless also contends that her insufficiency point should be sustained because the voluntary statement she gave to the authorities is entirely exculpatory and the State is bound by the assertions in it under the "voucher rule." We overrule this contention. The common law "voucher rule" was effectively repealed by the adoption of TEX.R.CRIM.EVID. 607, which provides for impeaching one's own witness. *Russeau v. State,* 785 S.W.2d 387 (Tex.Crim.App.1990).

Loveless next complains that the trial court erred in refusing to grant her motion for a separate trial. She argues that the evidence presented by her defense counsel at a pretrial hearing showed that a joint trial would deprive her of a fundamentally fair trial.

■ Under TEX.CODE CRIM.PROC.ANN. art. 36.09 (Vernon 1981), severance is mandatory where one defendant has an admissible prior conviction and the person seeking the severance does not; otherwise, severance is not a matter of right, but rests within the sound discretion of the trial court. *Garza v. State,* 622 S.W.2d 85 (Tex. Crim.App.1981) (opinion on rehearing); *Dawson v. State,* 477 S.W.2d 277 (Tex. Crim.App.1972). Abuse of discretion will be found only when the movant for severance has satisfied the heavy burden of showing clear prejudice. *United States v. Welch,* 656 F.2d 1039 (5th Cir.1981); *Foster v. State,* 652 S.W.2d 474 (Tex.App.—Houston [1st Dist.] 1983), *aff'd,* 693 S.W.2d 412 (Tex.Crim.App.1985).

■ The only evidence offered in support of Loveless' motion for severance was the testimony of her defense counsel at a pretrial hearing. He testified that, based on his investigation of the case, Loveless and co-defendant Miller held adversarial positions because they were charged with the same offense and because the victim was the natural daughter of Loveless but not Miller. However, defense counsel offered no proof that a joint trial might be prejudicial to Loveless. No previous conviction against either Loveless or Miller was offered into evidence. Loveless argues that because Miller's statement and oral representations as to how the injuries happened differed from her statements, she was prejudiced when Miller's explanations were impeached by the physical facts. We disagree. Taking all of the statements, oral and written, together and in context, Miller's and Loveless' explanations were essentially the same, and were both effectively refuted by the physical evidence. Counsel's allegations that Loveless and Miller were adverse to each other is not borne out

by the record. In fact, defense counsel testified that he knew of no statements that his client or Miller made to the authorities that implicated the other as the one who committed the offense.

Loveless argues that the most clear ground for severance is shown by the State's alleged "admission" that a joint trial was a strategy to place the co-defendants in adversarial positions. At a pretrial hearing, defense counsel offered a bill of exceptions when the State objected to his attempt to testify about plea negotiations he had with the State. Defense counsel then called the prosecutor to the witness stand, and the following exchange took place.

Q  On August 24, 1989, did you express to me, representing Deborah Tucker Loveless, an opinion as to whether she was guilty of participation in the death of April Tucker?

A  I remember that you and I, during the—

Q  Just answer my question, Mr. Smith.

. . . .

A  I don't remember the exact date. I will take your word that that is the correct date.

Q  (by Mr. Cobb) You did express an opinion?

A  I remember that you and I had discussions regarding plea negotiations, yes.

Q  What was the nature and content of that discussion?

A  The nature and the content went basically to your client's plea to certain charges that—I don't remember if we discussed a specific charge. There were two or three that were bounced around, that she would come forward and testify against John Harvey Miller.

Q  In exchange, she would not be prosecuted for murder?

A  That was one of the things that was discussed, yes.

Q  Did you state that because there was no direct evidence that she had participated in the death of April Tucker, that, in your opinion, she was not guilty of the offense of murder?

A  I think what I—if I recall what I stated, I think that at that time, my state of mind was that she was not an active participant in the actual murder.

Q  And you advised me and delivered to me a copy of a polygraph report at that time that confirmed that position; is that correct?

A  Well, I don't ever presume to know the validity of any polygraph examination or any polygraph examiner since polygraph examinations are not admissible in court. They are only a tool used by some law enforcement agents.

Q  Let me show you what's marked Defendant's Exhibit No. 1. Can you identify that?

A  It appears to be a Department of Public Safety polygraph report.

Q  It appears to be one that you gave me on that date, or about the date we met?

A  I remember delivering this among some other documents to you with regard to discovery.

. . . .

Q  (by Mr. Cobb) And at that time, it was the intent of your offer to put Debbie Loveless in the adversarial position against John Miller of becoming a witness against him in exchange for dismissal of the murder charge?

A  Absolutely.

It is clear from the above testimony that the State had offered to prosecute Loveless on a lesser charge in exchange for her testimony against co-defendant Miller. However, a mere offer does not create adverse positions. The parties were not in adversarial positions at the trial. Loveless has failed to meet her burden of showing clear prejudice. The denial of Loveless' motion for severance was within the sound

discretion of the trial court, and no abuse of discretion is shown. *Foster v. State, supra.*

Loveless next complains of alleged prosecutorial misconduct. She contends that the trial was fundamentally unfair from the beginning because of the prosecutor's trial strategy, which was allegedly intended to create adversarial positions between her and co-defendant Miller.

Again, Loveless refers to the prosecutor's pretrial testimony. Loveless contends that the State's threat to prosecute a charge not supported by probable cause deprived her of a fair trial and due process of law. It is evident from the record that the prosecutor's testimony at pretrial refers to statements he made during plea negotiations with defense counsel two months before trial. However, there is nothing in the record that reflects that the State's offer during plea negotiations was in fact accepted by Loveless. On the contrary, it is obvious that the State's offer was rejected and no bargain was struck. If there is no plea bargain agreement, the prosecutor has not breached any duty. *Rodriguez v. State,* 509 S.W.2d 319 (Tex. Crim.App.1974). Although the assistant district attorney expressed doubts as to Loveless' guilt during plea negotiations, it was not misconduct for him to go forward with the prosecution, especially given the fact that a grand jury indicted Loveless, and the evidence adduced at trial has been found sufficient to support her conviction. A prosecutor must be allowed to exercise broad discretion to determine the extent of society's interest in a given prosecution. An initial assessment should not dictate future conduct. *United States v. Goodwin,* 457 U.S. 368, 102 S.Ct. 2485, 73 L.Ed.2d 74 (1982). The point of error is overruled.

Loveless next complains that the trial court erred in not declaring a mistrial because of an alleged prosecutorial comment concerning her failure to testify at trial. The comment complained of came during the State's case in chief, where counsel for co-defendant Miller was cross-examining a State's witness. The following exchange took place:

Q Okay. Now then, with regard to your talking with Mrs. Loveless there that night, you were aware at that time, were you not, that she had just lost a child?

A Yes, sir, I was aware of that.

Q And was her demeanor that of a mother who had just lost a child; that is, by distraught?

MR. SMITH: Excuse me. I object. That calls for speculation.

THE COURT: Sustained.

Q (by Mr. Chitwood) Did she appear, to you, to be nervous?

A Yes, sir. I would have to say that.

Q All right. Did she appear to you to be greatly concerned about the loss of this child?

MR. SMITH: Excuse me. Greatly concerned—Judge, that's not a question that this witness can answer. I mean, there's only one witness in this room that can answer that question, and she's sitting over there.

Loveless' defense counsel objected to the prosecutor's statement and requested the court to instruct the jury to disregard. The request was granted by the trial court and the jury was instructed. However, defense counsel asked for no further relief.

Impermissible comment on an accused's failure to testify is made when the language is manifestly intended, or is of such a character that the jury would naturally and necessarily take it to be a comment on the failure to testify. *Paster v. State,* 701 S.W.2d 843 (Tex.Crim.App.1985). It is not sufficient that the language implies or alludes to the failure to testify; the language must necessarily refer to the failure to testify. *Bird v. State,* 527 S.W.2d 891 (Tex.Crim.App.1975).

The prosecutor's statement was not of such a character that the jury would naturally and necessarily take it as a direct

comment on her failure to testify. *McKay v. State*, 707 S.W.2d 23 (Tex.Crim.App. 1985), *cert. denied*, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986). In fact, the trial court interpreted the statement not as a comment on Loveless' failure to testify, but as an objection by the prosecution based on speculation. Furthermore, the court instructed the jury that they were not to consider Loveless' failure to testify for any purpose. Loveless received all of the relief that she requested. She did not move for a mistrial. Nothing is presented for review. *Hopkins v. State*, 480 S.W.2d 212 (Tex.Crim.App.1972); Tex.R.App.P. 52(a).

■ In Loveless' final point of error she complains that the trial court erred in admitting hearsay evidence. Over objection, oral and written statements given by co-defendant Miller were admitted at trial. Loveless contends that the introduction of these statements by a nontestifying co-defendant is a violation of the hearsay rule and denies her the right of confrontation and cross-examination. We disagree.

■ The statements were not hearsay. The voluntary statement of Miller was not offered by the State to prove the truth of the matter asserted. It was offered for the purpose of showing what he said happened on the day of April's death. An out-of-court statement offered for the purpose of showing what was said, and not for the truth of the matter stated, does not constitute hearsay. *McKay v. State, supra*. Moreover, Loveless has failed to show how the introduction of such statements harmed her. Nothing is contained in the statements that implicate Loveless as committing any illegal act. Furthermore, the complained-of statement is almost identical to the statement given to the police by Loveless. Loveless' statement was introduced at trial without objection. Thus, there was no harm to Loveless in any event.

For the reasons stated, the judgment of the trial court is affirmed.