Linda Ann LOVEN, Appellant,

v.

The STATE of Texas, Appellee.

No. 07-90-0206-CR.

Court of Appeals of Texas,
Amarillo.

April 30, 1992.

Greta Rapstine Crofford, Amarillo, for appellant.

Before REYNOLDS, C.J., and DODSON and POFF, JJ.

POFF, Justice.

Appellant Linda Ann Loven was convicted by a jury of the murder of her two-year-old son, Stephen Mathew Loven. The jury assessed punishment at sixty-five years confinement in the Texas Department of Corrections.[1]

In three points of error, appellant contends (1) the evidence is insufficient to support her conviction; (2) the trial court erred in admitting a videotape concerning seizure disorders; and (3) the trial court erred in allowing appellant's mother-in-law to testify because such testimony was in violation of "the Rule." We will overrule all three points of error and affirm the judgment.

■ In her first point of error, appellant contends the evidence is insufficient to support her conviction. In resolving this point, the applicable standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573 (1979); *see Ransom v. State,* 789 S.W.2d 572 (Tex.Crim.App.1989).

It is undisputed that appellant's conviction was based on circumstantial evidence. While the Court of Criminal Appeals has recently rejected the "reasonable-hypothesis-of-innocence analytical construct" as a method of appellate review for evidentiary sufficiency in circumstantial evidence cases, *Geesa v. State,* 820 S.W.2d 154 (Tex. Crim.App.1991), the court's opinion only applies prospectively. In other words, the court's rejection of the construct applies only to the parties in the *Geesa* case and to those cases tried after the effective date of the *Geesa* opinion. The court's rejection of the construct does not apply to cases pending on direct review at the time of the *Geesa* opinion. Thus, in deciding this appeal, we are to apply the law as it existed prior to *Geesa,* and make use of the "reasonable-hypothesis-of-innocence analytical construct" in analyzing appellant's first point of error. "A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other *reasonable* hypothesis except that of guilt of the defendant." *Goff v. State,* 777 S.W.2d 418, 420 (Tex.Crim.App.1989) (emphasis added).

Appellant contends that the State did not exclude every reasonable hypothesis other than her guilt. The State concedes that while every hypothesis other than appellant's guilt may not have been excluded, every *reasonable* hypothesis was eliminated. "It is not required that the circumstances should, to a moral certainty, actually exclude *every* hypothesis [other than appellant's guilt], but the evidence must show that the hypothesis is a *reasonable* one, consistent with the circumstances and the facts proved." *Stoker v. State,* 788 S.W.2d 1, 6 (Tex.Crim.App.1989) (emphasis added). The question before this court is whether any hypotheses which exculpate appellant for the death of her son Stephen are reasonable. If so, the evidence is insufficient to support appellant's conviction.

---

**1.** Now the Texas Department of Criminal Justice, Institutional Division.

On the morning of October 11, 1989, an Amarillo police officer was dispatched to appellant's residence regarding the death of an infant. The officer found Stephen Loven lying dead in his crib with his right hand bandaged, a bloated stomach and small bruises on the right side of his face. The next day, appellant gave a written statement to police, the pertinent part of which read:

On Tuesday evening, 10–10–89, I was at home with my two children, Stephen Mathew Loven, 2 years old and Lonnie Donald Loven, 3 years old. My husband Lonnie Floyd Loven was at work. Stephen and I were both sick with the flu. I had taken both of us to the doctor earlier that day. Then that evening sometime between 8:00 and 9:00 p.m. I was rocking Stephen because he had been throwing up and real fussy. I was real sick and getting frustrated with everything. This is when Donnie, my 3 year old, came into the room wanting some water. It seemed like everything kind of exploded. I then threw Stephen down in [sic] the floor. He landed on the back of his head. I just left him there while I tended to Donnie. When I came back, I realized that Stephen was hurt. I held him and he cried for a short time. When he stopped crying, I put him to bed. I knew that he was hurt but I was scared to call for an ambulance or take him to the hospital. I was afraid of what they would do to me.

Dr. Ralph Erdmann, a forensic pathologist, performed an autopsy on Stephen's body. He discovered a subdural hemorrhage in the skull area and a skull fracture. Dr. Erdmann testified that the hemorrhage was the result of a recent injury while the fracture had occurred on a previous occasion. He concluded that blunt force trauma had caused the hemorrhage.

Dr. Erdmann also found that Stephen's bloated stomach had been caused by a hemorrhage due to a laceration of his liver. Segments of his bowel were also badly bruised. Stephen's hand had been bandaged because of a burn injury. Dr. Erdmann also discovered evidence of an old injury, a fractured rib.

Dr. Erdmann opined that the cause of Stephen's death was blunt force trauma to the head. The laceration of Stephen's liver was also potentially fatal. Dr. Erdmann estimated the time of Stephen's death at about 1:30 a.m. on October 11. He estimated that Stephen sustained both the injury to his head and the injury to his liver about four to six hours prior to death. Dr. Erdmann testified that the injuries to Stephen's skull, liver and small bowel were all separate injuries and that all three of the injuries were caused by some sort of blunt force trauma. The injuries were not consistent with being tossed on the floor; rather, the injuries were consistent with direct impact from something such as a hand, a foot or the end of a broom.

Dr. Mark Krouse, a pathologist and the Deputy Chief Medical Examiner of the Tarrant Medical Examiner's District, examined the autopsy photographs of the deceased and the autopsy protocol of Dr. Erdmann. Consistent with Dr. Erdmann's opinion, Dr. Krouse testified that he believed Stephen had died as a result of blunt force trauma to the head. He noted that the injury to the liver was so severe that it was almost a fracture instead of a laceration. Dr. Krouse placed the time of death at 1:30 a.m. to 3:30 a.m. on October 11. He believed Stephen had incurred at least four blows to his body the evening prior to his death. Dr. Krouse testified that Stephen's multiple injuries were not consistent with being thrown to the ground a single time. Dr. Krouse further stated that in order for Stephen to have incurred the skull injury, he would have had to have been dropped from a height of twenty to thirty feet onto the carpeted floor in appellant's home.

While the foregoing evidence reasonably supports the hypothesis that appellant inflicted the injuries upon Stephen which resulted in his death, appellant contends the evidence supports three reasonable hypotheses other than her guilt. First, appellant claims that Stephen's three-and-one-half-year-old brother, Donnie, could have inflicted the injuries. On cross-examination, Dr. Erdmann admitted that a three-and-one-

half-year-old child could have hit a two-year-old child on the head with a shovel and caused a contusion. Appellant told her husband that Donnie had thrown a toy at Stephen and hit him in the head. Dr. Erdmann also testified that a two-year-old's liver could be cut as a result of a three-and-one-half-year-old child kicking him in the stomach.

Second, appellant claims that Stephen's injuries may have been self-inflicted. Dr. Erdmann testified on cross-examination that if a two-year-old child such as Stephen was running very fast he could fall, slide and hit his head, causing an injury to the top of his head. Dr. Erdmann also admitted that a child could injure the top of his head by standing up suddenly under a table and hitting his head. Dr. Krouse, also on cross-examination, testified that Stephen could possibly have injured his head as the result of falling and hitting his head on a coffee table like the one in appellant's living room.

We do not find either of the foregoing hypotheses to be reasonable. The evidence clearly showed that Stephen had incurred at least three separate blunt force injuries a few hours before his death. The extent and severity of Stephen's injuries did not reflect a single freak accident or a single instance of injury at the hands of his brother. *See Lindsey v. State,* 501 S.W.2d 647, 648 (Tex.Crim.App.1973). Further, the fact that appellant admitted injuring Stephen the night before his death militates against the reasonableness of the foregoing hypotheses. *Id.* It is undisputed that, other than Stephen's three-and-one-half-year-old brother, no one except appellant was with Stephen the night before his death. Consistent with several similar cases,[2] we find neither of the foregoing hypotheses to be reasonable.

■ Appellant advances a third allegedly reasonable hypothesis; namely, that she was in the midst of an epileptic seizure when she violently injured Stephen. We initially note that, if proven, a defendant's claim that he or she acted unconsciously during the throes of an epileptic seizure is a valid defense. Texas courts have held that states of unconsciousness or automatism, including epileptic states, are includable in the defense of insanity. *Bradley v. State,* 102 Tex.Crim. 41, 277 S.W. 147, 148–50 (1925) (somnambulism recognized as a form of insanity); *Zimmerman v. State,* 85 Tex.Crim. 630, 215 S.W. 101, 105–06 (1919) (same rule should apply for "epileptic insanity" as for "insanity of any other character"). Appellant's hypothesis, therefore, is clearly one that absolves her of guilt if it is found to be reasonable.

Dr. Joseph Batson, a neurologist, testified that he examined appellant and concluded she had "complex partial seizure disorder." Dr. Mark Stevens, appellant's personal physician, stated that the symptoms for which he had treated appellant prior to the date of Stephen's death could possibly be consistent with complex partial seizure disorder. Additionally, the evidence showed that appellant experienced some kind of a seizure while incarcerated in the Randall County jail. Both Dr. Batson and Dr. Stevens testified that in the last stage of a seizure, known as the post-ictal stage, a person having a seizure may exhibit violent and aggressive behavior and is capable of causing personal injury. Dr. Batson also testified that an epileptic could exhibit violent behavior during the ictal stage of a seizure.

Dr. Batson, however, stressed that appellant would not have a vivid recollection of the details surrounding Stephen's injury if she had been experiencing a seizure at that time. Dr. Preston Shaw, an expert in the field of forensic psychiatry, stated that a person in the ictal stage of an epileptic seizure could not have recalled his or her

---

**2.** *See e.g., Allen v. State,* 651 S.W.2d 267 (Tex.Crim.App.1983); *Ruben v. State,* 645 S.W.2d 794 (Tex.Crim.App.1983); *Plunkett v. State,* 580 S.W.2d 815 (Tex.Crim.App.1979); *Ray v. State,* 160 Tex.Crim. 12, 266 S.W.2d 124 (1954), *overruled on other grounds,* 388 S.W.2d 690, 697–98 (Tex.Crim.App.1965); *Loveless v. State,* 800 S.W.2d 940 (Tex.App.—Texarkana 1990, pet. ref'd); *Battle v. State,* 681 S.W.2d 104 (Tex.App.—Houston [14th Dist.] 1984, pet. ref'd); *McClinton v. State,* 647 S.W.2d 400 (Tex.App.—Fort Worth 1983, pet. ref'd); *Huerta v. State,* 635 S.W.2d 847 (Tex.App.—Corpus Christi 1982, pet. ref'd).

actions during that particular stage. Appellant, however, made a detailed statement that she threw Stephen to the floor the night before his death. In light of the psychiatric evidence, such a statement weakens appellant's hypothesis that she was experiencing a seizure when she injured Stephen.

Also to be considered is the fact appellant told a friend that: (1) Stephen had died from the flu; (2) a man had broken into her home, raped her, and struck Stephen on the head; (3) Stephen had been abused by a babysitter; (4) Stephen's three-and-one-half-year-old brother had injured him; and (5) she had killed Stephen during an epileptic seizure. Dr. Shaw testified that appellant's relation of different versions of the events leading to Stephen's death was consistent with an absence of memory as to what really occurred. Dr. Shaw did admit, however, that it would not be unusual for someone who had killed his or her child to make up different stories concerning the manner in which the child's death came to pass.

Significantly, Dr. Gerald Moriarty, Associate Chairman of the Department of Neurology and Psychiatry at Texas Tech Medical School, testified concerning a study published in the New England Journal of Medicine. This study screened 5,400 persons with complex partial seizure disorder. Only nineteen of those persons had a history of violent behavior associated with seizures. These nineteen people were then recorded having seizures. An examination of those recordings revealed that the worst instance of violence displayed by any of the nineteen persons was a push and shove. Another one of the nineteen persons tried to reach out and scratch at a person's face. This study showed the unlikelihood of a person in the midst of a seizure engaging in the rather complicated behavior of striking another person numerous times. Addi-

tionally, in testimony unrelated to the study, Dr. Shaw testified that the ability to inflict blunt force trauma is inconsistent with being in the ictal stage of a seizure.

We conclude that the third hypothesis advanced by appellant is unreasonable in light of the cumulative force of all the evidence. An exculpatory hypothesis is not reasonable if "the conclusion of [appellant's] guilt is warranted by the combined and cumulative force of all the evidence." *Ransom v. State*, 789 S.W.2d 572, 577 (Tex. Crim.App.1989). Given the evidence of multiple instances of blunt force trauma, the inability of a person in the midst of a seizure to engage in such conduct and appellant's detailed recollection regarding the events on the eve of Stephen's death, we find the hypothesis that appellant injured her son during an epileptic seizure to be extremely unlikely at best. We do not believe appellant's third hypothesis is consistent with the circumstances and the facts proved. *See Stoker v. State*, 788 S.W.2d at 6. Appellant's first point of error is overruled.

In her second point of error, appellant contends that the trial court erred in admitting a videotape on the subject of seizure disorders. The State proffered the videotape in connection with the testimony of Dr. Moriarty. Dr. Moriarty testified that the videotape was used as an aid in teaching Texas Tech medical students about complex partial seizure disorders. Dr. Moriarty felt that if the members of the jury could see the videotape they would be better able to understand his testimony regarding seizures.

Appellant specifically objected that presentation of the videotape would deny her the right to cross-examine the narrator of the tape.[3] The right of cross-examination is implicit in the constitutional right of confrontation. *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S.Ct. 1038, 1045, 35

---

3. Appellant also objected that because the videotape showed only one kind of complex partial seizure disorder, the jury would be misled in several respects. We view this objection as an objection on the basis of Tex.R.Crim.Evid. 403; *i.e.*, the probative value of the videotape, assuming it is admissible, is substantially outweighed by the danger of misleading the jury. In addressing the confrontation issue, we will resolve this objection also for if appellant's right of cross-examination was protected, then she had ample opportunity to correct any misimpression the videotape may have left on the jury.

L.Ed.2d 297, 309 (1973); *Porter v. State*, 578 S.W.2d 742, 745 (Tex.Crim.App.1979). The right of a criminal defendant to confront and cross-examine the witnesses against him or her is guaranteed by the Sixth Amendment of the United States Constitution. The Fourteenth Amendment of the Constitution makes the Confrontation Clause applicable to the states. *Pointer v. Texas*, 380 U.S. 400, 403, 85 S.Ct. 1065, 1067, 13 L.Ed.2d 923, 926 (1965). Article I, section 10 of the Texas Constitution also gives a defendant the right of confrontation.[4]

While a defendant's right to confrontation and cross-examination is constitutionally safeguarded, such right is not absolute. *Chambers v. Mississippi*, 410 U.S. at 295, 93 S.Ct. at 1045; *Porter v. State*, 578 S.W.2d at 745. If literally applied, the Confrontation Clause would abrogate virtually every hearsay exception, but the Supreme Court has long rejected such an approach as unintended and too extreme. *Maryland v. Craig*, 497 U.S. 836, ——, 110 S.Ct. 3157, 3166, 111 L.Ed.2d 666, 680 (1990); *Ohio v. Roberts*, 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597, 605–06 (1980); *see Mattox v. United States*, 156 U.S. 237, 243, 15 S.Ct. 337, 339, 39 L.Ed. 409, 411 (1895) (recognizing the admissibility against an accused of dying declarations and of testimony of a deceased witness who has testified at a former trial).

■ In this case, we agree as do appellant and the State that the videotape constitutes hearsay. The State argues that appellant's objection as to the denial of cross-examination is defeated because the videotape was properly admitted under the learned treatise exception to the hearsay rule. Tex.R.Crim.Evid. 803(18). This argument is flawed, for "[t]he United States Supreme Court has acknowledged that it has 'more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception.'" *Holland v. State*, 802 S.W.2d 696, 699 (Tex. Crim.App.1991) (quoting *California v. Green*, 399 U.S. 149, 155–56, 90 S.Ct. 1930, 1934, 26 L.Ed.2d 489, 495 (1970)). While hearsay rules and the Confrontation Clause are generally designed to protect similar values, the Confrontation Clause's prohibitions are not to be equated with the general rule prohibiting the admission of hearsay statements. *Idaho v. Wright*, 497 U.S. 805, ——, 110 S.Ct. 3139, 3146, 111 L.Ed.2d 638, 651 (1990).[5] The Confrontation Clause "bars the admission of some evidence that would otherwise be admissible under an exception to the hearsay rule." *Id.; see United States v. Inadi*, 475 U.S. 387, 393 n. 5, 106 S.Ct. 1121, 1125 n. 5, 89 L.Ed.2d 390, 397 n. 5 (1986).

In *Ohio v. Roberts*, 448 U.S. at 65, 100 S.Ct. at 2538, the Supreme Court set forth two requirements that the State must meet before hearsay declarations may be admitted against a defendant without violating his or her rights under the Confrontation Clause. Initially, the State must demonstrate a necessity for the admission of the hearsay evidence; *i.e.*, the State must demonstrate the unavailability of the declarant. Once the unavailability of the witness has been demonstrated, the State must show that the hearsay has sufficient indicia of reliability to warrant its admission. *Id.* If

---

**4.** Article I, section 10 is worded differently than the Sixth Amendment and arguably allows more protection to an accused than does the United States Constitution. *Long v. State*, 742 S.W.2d 302, 309 n. 9 (Tex.Crim.App.1987). However, "Texas case law generally interprets Confrontation Clause values in much the same way as do the federal cases." Jonathon S. Miller, Comment, *Does the Child Witness Videotape Statute Violate the Confrontation Clause?: Article 38.-071, Texas Code of Criminal Procedure*, 17 Tex. Tech L.Rev. 1669, 1681 (1986). Therefore, at least for purposes of this opinion, we do not construe the Texas Constitution as providing an accused a greater right of confrontation than

does the Sixth Amendment. We will apply the same legal analysis in protecting appellant's rights under the Confrontation Clauses of both the state and federal constitutions.

**5.** The Court of Criminal Appeals has observed that a hearsay objection and an objection to a violation of the Confrontation Clause "are neither synonymous nor necessarily coextensive." *Holland v. State*, 802 S.W.2d at 700. In *Holland*, the court ruled that where a defendant objected to the admission of evidence only on the basis of hearsay, he preserved no error as to violation of the Confrontation Clause. *Id.*

the evidence falls within a firmly rooted hearsay exception then reliability can be inferred. *Id.*

Subsequent to *Roberts*, the Supreme Court held that the initial requirement of showing unavailability is not always necessary. In *United States v. Inadi*, 475 U.S. at 394–400, 106 S.Ct. at 1125–29, the Court held that the out-of-court statements of a co-conspirator were admissible without the necessity of the State proving the co-conspirator was unavailable to testify at trial. While the co-conspirator exception is the only specific exception the Supreme Court has made to the *Roberts* unavailability requirement, the *Inadi* Court intimated that a showing of unavailability may not be required in other situations:

> *Roberts* should not be read as an abstract answer to questions not presented in that case, but rather as a resolution of the issue the Court said it was examining: "the constitutional propriety of the introduction in evidence of the preliminary hearing testimony of a witness not produced at the defendant's subsequent state criminal trial."
>
> \* \* \* \* \* \*
>
> *Roberts* must be read consistently with the question it answered, the authority it cited, and its own facts.... *Roberts* cannot fairly be read to stand for the radical proposition that no out-of-court statement can be introduced by the government without a showing that the declarant is unavailable.

*Id.* at 397–98, 106 S.Ct. at 1127–28.

The Texas Court of Criminal Appeals has recognized that more exceptions to the *Roberts* unavailability requirement than just the co-conspirator exception may exist. *Holland v. State*, 802 S.W.2d at 699 n. 5. Other jurisdictions have similarly recog-

nized that there may be other exceptions to the unavailability requirement. Some courts, in fact, have explicitly created other exceptions.[6] On the basis of the *Holland* decision, we believe that the mandate from our Court of Criminal Appeals does not require a showing of unavailability in all cases. Therefore, it is incumbent upon this court to determine whether evidence may be admitted under the learned treatise exception, Tex.R.Crim.Evid. 803(18), without a showing of unavailability.

As a starting point, we return to the *Inadi* decision to examine the reasons underlying the Supreme Court's abrogation of the unavailability requirement in situations involving co-conspirators' out-of-court statements. The Court reasoned as follows:

> There are good reasons why the unavailability rule, developed in cases involving former testimony, is not applicable to co-conspirators' out-of-court statements. Unlike some other exceptions to the hearsay rules, or the exemption from the hearsay definition involved in this case, *former testimony is only a weaker substitute for live testimony.* It seldom has independent evidentiary significance of its own, but is intended to replace live testimony. If the declarant is available and the same information can be presented to the trier of fact in the form of live testimony, with full cross-examination and the opportunity to view the demeanor of the declarant, there is little justification for relying on the weaker version. When two versions of the same evidence are available, longstanding principles of the law of hearsay, applicable as well to Confrontation Clause analysis, favor the better evidence. But if the declarant is unavailable, no "better" version of the evidence exists, and the former testimo-

---

6. *See e.g., Manocchio v. Moran,* 919 F.2d 770, 774 (1st Cir.1990) (showing of unavailability not required for business records and public records exceptions to hearsay rule); *People v. Roy,* 201 Ill.App.3d 166, 146 Ill.Dec. 874, 883, 558 N.E.2d 1208, 1217 (1990) (showing of declarant's unavailability not required to admit testimony of physician under exception to hearsay rule for statements made for purposes of medical diagnosis and treatment); *State v.*

*Fischer,* 459 N.W.2d 818, 820–22 (N.D.1990) (in the face of Confrontation Clause objection, court allowed admission of chemical analysis report pursuant to state statute despite fact that chemist who performed analysis did not testify and was not shown to be unavailable); *State v. Sosa,* 59 Wash.App. 678, 800 P.2d 839, 842–43 (1990) (not necessary to show unavailability of crime lab expert to have lab report admitted pursuant to statutory hearsay exception).

ny may be admitted as a substitute for live testimony on the same point.

Those same principles do not apply to co-conspirator statements. Because they are made while the conspiracy is in progress, such statements provide evidence of the conspiracy's context that cannot be replicated, even if the declarant testifies to the same matters in court.

\*    \*    \*    \*    \*    \*

The admission of co-conspirators' declarations into evidence thus actually furthers the "Confrontation Clause's very mission" which is "to advance 'the accuracy of the truth-determining process in criminal trials.' "

*United States v. Inadi,* 475 U.S. at 394–95, 106 S.Ct. at 1125–26 (citations omitted) (emphasis added).

■ As the above quotation shows, former testimony is an inferior substitute for live testimony. "But while live testimony is better than former testimony, it is not necessarily better than the type of co-conspirator. hearsay at issue in *Inadi.*" *Manocchio v. Moran,* 919 F.2d 770, 774 (1st Cir.1990). We read *Inadi* for the proposition that where hearsay testimony is inferior to a nonhearsay version of the same evidence, admissibility is conditioned upon a showing of unavailability of the hearsay declarant. When the hearsay testimony is not inferior, as in the co-conspirator situation, a showing of unavailability is not required.

■ We do not find evidence contained in a learned treatise to be inferior to live testimony by the author of the treatise or by some other expert. *See Dutton v. Evans,* 400 U.S. 74, 95–96, 91 S.Ct. 210, 222–23, 27 L.Ed.2d 213, 231 (1970) (Harlan, J., concurring) (in the case of learned treatises, production of the declarant is likely to be pointless). In most cases, a treatise will better communicate the basics of a particular subject to the jury than will an expert speaking extemporaneously. Additionally, a learned treatise is only admissible in conjunction with testimony by an expert witness. *E.g.,* Tex.R.Crim.Evid. 803(18); *Dartez v. Fibreboard Corp.,* 765 F.2d 456, 465 (5th Cir.1985); *Tart v. McGann,* 697 F.2d 75, 78 (2d Cir.1982); *Zwack v. State,* 757 S.W.2d 66, 68–69 (Tex.App.—Houston [14th Dist.] 1988, no pet.). Thus, the risk that a treatise might be misunderstood and misapplied by the jury is avoided because "an expert is on the stand and available to explain and assist in the application of the treatise." Fed.R.Evid. 803 advisory committee's note.

The fact that an expert is available to answer questions concerning the treatise and its application to the case in question is of utmost importance to our determination that evidence contained in a learned treatise is not inferior to live testimony by the author of the treatise. American courts have traditionally been unwilling to admit learned treatises as independent evidence of the facts and opinions stated therein. *See e.g., Bowles v. Bourdon,* 148 Tex. 1, 6, 219 S.W.2d 779, 783 (1949); *Goodnight v. Phillips,* 458 S.W.2d 196, 203 (Tex.Civ. App.—Houston [1st Dist.] 1970, writ ref'd n.r.e.). The main reason for this unwillingness was that the author of the treatise was not available for cross-examination and thus the accuracy of the author's statements could not be tested. *Bowles v. Bourdon,* 219 S.W.2d at 783. Because an expert must now be available for cross-examination whenever a learned treatise is admitted into evidence, there no longer exists any good reason to refuse to admit learned treatises as substantive evidence. Similarly, there is no longer any reason to believe that evidence contained in a learned treatise is inferior to live testimony by the author of the treatise.

We also note one more safeguard against jury misinterpretation. Tex.R.Crim.Evid. 803(18) mandates that "the statements may be read into evidence but may not be received as exhibits." This restriction "prevent[s] a jury from rifling through a learned treatise and drawing improper inferences from technical language it might not be able properly to understand without expert guidance." *Tart v. McGann,* 697 F.2d at 78–79 n. 2 (quoting *United States v. Mangan,* 575 F.2d 32, 48 n. 19 (2d Cir.), *cert. denied,* 439 U.S. 931, 99 S.Ct. 320, 58 L.Ed.2d 324 (1978)). Because we believe

that a learned treatise is not inferior to live evidence from an expert witness, we hold that the Confrontation Clause is not violated by the admission of a learned treatise even though there is no showing that the declarant is unavailable.

◼ The above holding does not end our Confrontation Clause analysis. The second requirement set forth in *Roberts* must be met. The State is required to show that the hearsay has sufficient indicia of reliability to warrant its admission. *Ohio v. Roberts*, 448 U.S. at 65, 100 S.Ct. at 2538. If the evidence falls within a "firmly rooted" hearsay exception, then reliability can be inferred. *Id.* Otherwise, the evidence is admissible only upon a showing that it possesses particularized guarantees of trustworthiness. *Id.; see also Idaho v. Wright*, 497 U.S. at ——, 110 S.Ct. at 3147, 111 L.Ed.2d at 652. Unlike the unavailability requirement, the reliability requirement has never been abrogated by the Supreme Court in any situation.

◼ We are unaware of any case authority holding whether the learned treatise exception is or is not a "firmly rooted" hearsay exception for purposes of the Confrontation Clause. The mere fact that the learned treatise exception is explicitly set forth as a specific exception to the hearsay rule does not mean it is firmly rooted. *See Idaho v. Wright*, 497 U.S. at ——, 110 S.Ct. at 3149, 111 L.Ed.2d at 654. The Supreme Court has identified only a few hearsay exceptions as firmly rooted: *e.g.*, co-conspirator statements, *United States v. Bourjaily*, 483 U.S. 171, 183, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144, 157 (1987); business records, *Ohio v. Roberts*, 448 U.S. at 66 n. 8, 100 S.Ct. at 2539 n. 8; cross-examined prior trial testimony, *Mancusi v. Stubbs*, 408 U.S. 204, 213–16, 92 S.Ct. 2308, 2313–15, 33 L.Ed.2d 293, 301–03 (1972); and dying declarations, *Pointer v. Texas*, 380 U.S. at 407, 85 S.Ct. at 1069. Simply because the Supreme Court has not specifically identified the learned treatise excep-

tion as one which is firmly rooted, however, does not preclude our authority to do so.

◼ The determination of whether a hearsay exception is firmly rooted does not turn upon how long the exception has been accepted, but rather upon how solidly it is grounded on considerations of reliability and trustworthiness. *State v. Martinez*, 150 Wis.2d 62, 440 N.W.2d 783, 789 (Wis. 1989). The rationale for the learned treatise exception lies in the fact that "a high standard of accuracy is engendered by various factors: the treatise is written primarily and impartially for professionals, subject to scrutiny and exposure for inaccuracy, with the reputation of the writer at stake." Fed.R.Evid. 803 advisory committee's note. The author of a treatise is likely to have been motivated in writing the treatise by a strong desire to accurately state the full truth. Edward W. Cleary, McCormick's Handbook of the Law of Evidence 743 (1972). Unlike an expert witness, the author of a learned treatise is impartial, disinterested and not awaiting a fee for testifying. Jack B. Weinstein & Margaret A. Berger, 4 Weinstein's Evidence ¶ 803–325 (1990).[7]

◼ We conclude that evidence meeting the requirements of rule 803(18) is, of necessity, reliable. Consequently, we find the learned treatise exception to the hearsay rule to be "firmly rooted." Thus, any evidence qualifying for admissibility as a learned treatise under rule 803(18) has sufficient indicia of reliability to meet the reliability requirement set forth in *Roberts*.

◼ Having determined that evidence coming within the learned treatise exception is admissible even if the declarant is not unavailable and that such evidence is always reliable, we turn our attention to the question of whether a videotape can qualify as a learned treatise. The Texas Rules of Criminal Evidence provide that the following evidence, although hearsay,

---

**7.** Professors Weinstein and Berger have also noted that "the difficulty with learned treatises is not the usual hearsay danger of admitting unreliable evidence, but rather the possibility that the jurors will misunderstand and misapply the evidence without expert guidance." *Id.* at ¶¶ 803–329 and 803–330.

is admissible as an exception to the hearsay rule:

> **Learned Treatises.** To the extent called to the attention of an expert witness upon cross-examination or relied upon him in direct examination, statements contained in published *treatises, periodicals,* or *pamphlets* on a subject of history, medicine, or other science or art, established as a reliable authority by the testimony or admission of the witness or by other expert testimony or by judicial notice. If admitted, the statements may be read into evidence but may not be received as exhibits.

Tex.R.Crim.Evid. 803(18) (emphasis added).

Clearly, a videotape is not a periodical or a pamphlet. Nor is it a treatise in the narrow sense.[8] Rule 803(18) does not extend to videotapes by virtue of its express language. However, we believe that rule 803(18) should be read contextually in order to promote the growth and development of the law of evidence. *See* Tex.R.Crim.Evid. 102. Videotapes are nothing more than a contemporary variant of a published treatise, periodical or pamphlet. We hold that videotapes may qualify as learned treatises for purposes of the learned treatise exception to the hearsay rule. *See State v. Jensen,* 735 P.2d 781, 790–92 (Ariz.1987); *Schneider v. Cessna Aircraft Co.,* 722 P.2d 321, 327–29 (Ariz.Ct.App.1985). *But see Simmons v. Yurchak,* 28 Mass.App.Ct. 371, 551 N.E.2d 539, 542–43 (1990).

■ Having held that a videotape can qualify as a learned treatise, we must now determine whether the videotape at issue in this case so qualifies. The videotape in question is entitled "How to Recognize and Classify Seizures." It was produced by the Epilepsy Foundation of America. The narrator is Dr. Richard L. Masland, Merit Professor Emeritus of Neurology at Columbia University and formerly the Executive Director of the National Commission for the Control of Epilepsy and its Consequences. The videotape is used at Texas Tech Medical School as a teaching tool during courses in neurology.

Specifically, the videotape explains the basics of seizures by dividing seizures into two types: partial and generalized. The tape then divides partial seizures into two types: simple and complex. The jury was shown the portion of the tape that discussed partial seizures, and, specifically, complex partial seizure disorders.

The tape was played for the jury following testimony of Dr. Moriarty. Dr. Moriarty is unquestionably an expert in the field of neurology and was accepted as such by the trial court. Dr. Moriarty testified that the videotape was accurate and came within the reasonable bounds of the medical literature on the subject of complex partial seizure disorders. We believe Dr. Moriarty's testimony was sufficient to establish the videotape as a reliable authority. Indeed, after viewing the tape, we also conclude that the videotape is a reliable authority on a subject of medicine. The tape was produced by an organization which one would expect to have an expert knowledge of epilepsy and was narrated by an authority in the field. We find that the videotape at issue is a learned treatise as that term is defined by Tex.R.Crim.Evid. 803(18).

■ Appellant argues that the court erred by admitting the videotape into evidence as an exhibit. Such admission was clearly erroneous. Tex.R.Crim.Evid. 803(18) states that learned treatises "may be read into evidence but may not be received as exhibits." However, we view this error as harmless. Nothing in the record indicates the members of the jury had access to a video cassette recorder so they could review the tape during their deliberations. The jury, therefore, could not have misapplied the exhibits. The trial court's error in admitting the videotape as an exhibit made no contribution to appellant's conviction or punishment and was therefore harmless. *See* Tex.R.App.P. 81(b)(2). Appellant's second point of error is overruled.

■ In her third point of error, appellant contends the trial court erred in allow-

---

**8.** Webster's Third New International Dictionary (1976), defines "treatise," in pertinent part, as "a writing (as a book or article) that treats a subject."

ing her mother-in-law, Hilde Loven, to testify because such testimony was in violation of what is commonly referred to as "the Rule." *See* Tex.R.Crim.Evid. 613 [9] and Tex.Code Crim.Proc.Ann. art. 36.05 (Vernon 1981).[10] We agree with appellant that Mrs. Loven's testimony was in violation of the Rule. However, we do not believe the violation requires a reversal of this case.

The Rule was invoked in this case at the beginning of trial. The record is clear that Mrs. Loven was present in the courtroom for the first two and one-half days of trial. During the third day of trial, however, Mrs. Loven complied with a request to leave the courtroom. She did not return to the courtroom until the fourth day of trial when the State attempted to have her testify as a rebuttal witness. Upon attempting to call Mrs. Loven to the stand, appellant objected that Mrs. Loven's testimony would be in violation of the Rule because she had been present in the courtroom during the first two and one-half days of trial.

In an effort to determine how much of the trial Mrs. Loven had attended, the court heard testimony from Mrs. Loven outside the presence of the jury. Mrs. Loven testified that she had been asked to leave the courtroom during the third day of trial. Her testimony as to the exact time of day she was asked to leave the court-room, however, was quite confused. She first testified that she was asked to leave "a little before lunch." She later testified that she was asked to leave "[b]efore we broke for lunch, I believe. It was after when we came back from lunch, then I was asked to leave."

The trial court ruled that Mrs. Loven could testify ·for the limited purpose of rebutting the testimony of Dr. Joseph Batson.[11] Dr. Batson had testified outside the presence of the jury on the morning of the third day of trial.[12] He was the last witness before the court recessed for lunch. When the court ruled that Mrs. Loven could testify, the court was under the impression that Dr. Batson had not testified until after lunch on the third day. Thus, the court issued its ruling allowing Mrs. Loven to testify while believing that Mrs. Loven had not heard the testimony of Dr. Batson. This may very well have been a mistaken belief. On the other hand, the court's belief may have been correct. The record is entirely inconclusive as to whether Mrs. Loven heard the testimony of Dr. Batson.[13]

Regardless of whether Mrs. Loven was present in the courtroom during Dr. Batson's testimony, her testimony was in violation of the Rule. It must be recognized,

**9.** Rule 613. Exclusion of Witnesses

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order on its own motion....

**10.** *Art. 36.05. Not to Hear Testimony*

Witnesses under rule shall be attended by an officer, and all their reasonable wants provided for, unless the court, in its discretion, directs that they be allowed to go at large; but in no case where the witnesses are under rule shall they be allowed to hear any testimony in the case.

**11.** Dr. Batson had testified that, in his opinion, appellant suffered from complex partial seizure disorder. He based his opinion partly on the fact that appellant told him she had suffered seizures in the past. Dr. Batson testified that appellant believed she had suffered seizures because her mother-in-law and her husband had told her that, on more than one occasion, she had stared off into space, exhibited non-responsiveness for about one minute, and been excessively sleepy and confused for about five min-

utes following the minute of non-responsiveness. Dr. Batson had not attempted to verify appellant's story with appellant's husband or appellant's mother-in-law. He admitted that if appellant's story was untrue his diagnosis would be affected.

Mrs. Loven testified that she had never observed appellant stare blankly into space or exhibit any other behavior associated with a seizure. This testimony, of course, was damaging to appellant.

**12.** Dr. Batson substantially repeated his testimony in the presence of the jury on the fourth day of trial. Mrs. Loven was definitely not present in the courtroom during this testimony.

**13.** Mrs. Loven testified that she did not recall hearing Dr. Batson testify. However, three doctors had testified prior to Dr. Batson and Mrs. Loven was admittedly confused *as to whether* she had been present during Dr. Batson's testimony. Thus, Mrs. Loven's testimony is of no real help in determining whether she was present during Dr. Batson's testimony.

however, that a violation of the Rule is not necessarily reversible error. *Guerra v. State,* 771 S.W.2d 453, 474 (Tex.Crim.App. 1988), *cert. denied,* 492 U.S. 925, 109 S.Ct. 3260, 106 L.Ed.2d 606 (1989); *Haas v. State,* 498 S.W.2d 206, 210 (Tex.Crim.App. 1973). "A violation of the rule may not be relied upon for reversal of the case unless it is shown that the trial court abused its discretion in allowing the alleged violative testimony to be elicited at trial." *Guerra v. State,* 771 S.W.2d at 474 (quoting *Archer v. State,* 703 S.W.2d 664, 666 (Tex.Crim. App.1986)); *see Cooper v. State,* 578 S.W.2d 401, 403 (Tex.Crim.App. [Panel Op.] 1979) (enforcement of the Rule is within the discretion of the trial court). As an appellate court, our task is to determine whether the trial court abused its discretion in allowing Mrs. Loven to testify in contravention of the Rule.

A two-step approach is taken in determining whether a trial court has abused its discretion in allowing a violation of the Rule. *Guerra v. State,* 771 S.W.2d at 476. The first step is to ascertain what kind of witness was involved. "If the witness was one who had no connection with either the State's case-in-chief or the defendant's case-in-chief and who, because of a lack of personal knowledge regarding the offense was not likely to be called as a witness, no abuse of discretion can be shown." *Id.* Under the second step of the analysis, we must determine whether (1) the witness actually conferred with or heard the testimony of another witness without court permission and (2) "the witness's testimony contradict[ed] the testimony of a witness he actually heard from the opposing side or corroborate[d] the testimony of another witness he actually heard from the same side on an issue of fact bearing upon the issue of guilt or innocence." *Id.* If both of the above criteria are met, then the trial court abused its discretion and reversible error is shown. *Id.*

In the instant case, we believe Mrs. Loven to have been a witness of the first type. She had no personal knowledge of the offense. The State never intended to call her as a witness until the State found it necessary to rebut the testimony of Dr. Batson. The record shows that the State never subpoenaed Mrs. Loven as a witness. Mrs. Loven had no connection with either the State's case-in-chief or the defendant's case-in-chief. Mrs. Loven testified under circumstances closely approximating the circumstances under which the witness in the *Guerra* case testified in violation of the Rule. *See id.* The Court of Criminal Appeals found that the witness in *Guerra* was a witness of the first type. *Id.* Thus, the *Guerra* court found no abuse of discretion on the part of the trial court in allowing the testimony of the witness in violation of the Rule. *Id.* Similarly, we find no abuse of discretion on the part of the trial court in allowing Mrs. Loven to testify in this case.

We find, however, that even if Mrs. Loven had been a witness of the second type described above, the trial court did not abuse its discretion in allowing her to testify. While her testimony clearly contradicted the testimony of Dr. Batson, the record is inconclusive as to whether Mrs. Loven *actually* heard him testify. Thus, both criteria under the second step of the analysis set forth in *Guerra* were not met. Reversible error would not have been shown. Appellant's third point of error is overruled.

Finding no error, we affirm the judgment.