

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-20-00001-CR

KENNIE LEWIS COOK, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2019F00062

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion on Remand by Justice van Cleef

MEMORANUM OPINION ON REMAND

A Cass County jury convicted Kennie Lewis Cook, Jr., of aggravated sexual assault of a child. The trial court sentenced Cook to forty years' imprisonment and ordered him to pay a $1,000.00 fine. In a prior opinion, we reversed the trial court's judgment and remanded the case for a new trial after sustaining Cook's complaint that the trial court erred by allowing an officer to testify that he believed the child victim. *Cook v. State*, 636 S.W.3d 35, 37 (Tex. App.—Texarkana 2021), *rev'd*, Nos. PD-0850-21, PD-0853-21, PD-0854-21, 2023 WL 152984 (Tex. Crim. App. Jan. 11, 2023). The Texas Court of Criminal Appeals declined to address whether the admission of the officer's testimony was error, but nevertheless found that Cook was unharmed by the officer's testimony. *Cook*, 2023 WL 152984, at *3. As a result, it reversed our opinion and remanded the case to us to "reach the merits of [Cook's] remaining grounds." *Id.* at *6.

Cook argues in his remaining grounds (1) that the jury's verdict is not supported by legally sufficient evidence,[1] (2) that the trial court should have ruled on his *Batson*[2] challenge, (3) that his counsel rendered ineffective assistance by failing to preserve his *Batson* challenge, and (4) that the trial court erred by permitting a witness to testify in violation of Rule 614, the witness sequestration rule.

We find (1) that legally sufficient evidence supported the jury's verdict of guilt, (2) that, while Cook's counsel waived his *Batson* challenge, harm from the alleged ineffective assistance

---

[1]In companion cause numbers 06-20-00002-CR and 06-20-00003-CR, Cook also appeals from two other convictions for aggravated sexual assault of the same child.

[2]*Batson v. Kentucky*, 476 U.S. 79 (1986).

of counsel is not shown, and (3) that the trial court did not abuse its discretion in overruling Cook's Rule 614 objection. As a result, we affirm the trial court's judgment.

## I.     Legally Sufficient Evidence Supports the Jury's Verdict of Guilt

### A.     The Evidence at Trial

The State's first witness was the victim, Chance Scallion,[3] who was seven when he made an outcry of sexual abuse against Cook. According to Chance, Cook sexually abused him at his great-grandmother's home after a church service at Hendrix Temple Institutional Church of God and Christ, where Cook served in various capacities, including as an organist and music director.

The evidence at trial established that Chance often went to church with his great-grandmother and church superintendent, Laura. Laura lived two blocks from the church and, after church concluded at 1:30 p.m., would always return to her home to prepare and serve a meal for the bishop and her grandson, Darrius, who attended church almost every Sunday. Cook ate with the group every other Sunday. Chance alleged that Cook abused him when he and Cook were alone in the living room of Laura's house after church "when Granny went to the bathroom."

According to Chance, Cook directed him to retrieve the television remote and "cut off the TV, [and] then . . . pulled [his] pants down," followed by his underwear. Chance said that Cook "put his finger in [his] butt," and "sucked [his] little thing." The child identified his "little thing" as "what [he] use[d] to go to the bathroom . . . number one." Chance said that his little thing was "[h]ard" and that Cook said that "[i]t taste[d] good." The child also testified that Cook "made [him] suck his little thing" with his mouth and that Cook's "little thing" was soft and looked like

---

[3]We use pseudonyms for the child victim and his family to protect the identity of the child. *See* TEX. R. APP. P. 9.10.

a crayon.  Chance testified that the acts made him feel sad and that he felt "[m]ad" when he saw Cook because of what he did.  Cook stopped when they heard Laura coming out of the bathroom and made "[Chance] pull back up [his] pants."

Chance's mother, Fiona, testified that she found Chance sucking the head of a yellow rubber duck during bath time and later caught him sucking his brother's penis.  When she asked Chance about his behavior, Fiona said Chance pointed to his penis and alleged that Cook had sucked it.  Fiona also said that Chance "put his hands in two girls' tops, in their shirt tops, and was touching their bottom[s]."  Chance testified that he "[s]ucked his [four-year-old brother's] little thing" because he was thinking about Cook.

Fiona testified that she grew up with Cook, that their families had close ties, and that she allowed Chance to be around Cook and accept gifts from him.  According to Fiona and Laura, Cook gave Laura money for Chance and bought Chance everything he asked for, including clothes, a backpack, school supplies, and toys.  Cook also took Chance to the movies, would drop the child off at school, and took him to band practice at another school where Cook was employed as the band director.  Testimony from both Chance and Cook showed that Chance was also allowed to spend two nights at Cook's apartment, unsupervised, where he slept with Cook in Cook's bed.  Laura testified that Cook lived alone and did not have a wife or girlfriend.

After Chance's outcry to Fiona, Fiona went to the church with Chance and asked him to tell Darrius about his allegations against Cook.  Chance testified that he denied the allegations in front of Darrius "[b]ecause somebody else was outside that day" who did not "need to know" about the abuse and said instead that Cook only "whooped [him]."  Both Fiona and Laura testified that Cook spanked Chance.  According to Laura, with her permission, Cook hit Chance

4

with a belt for "showing out" in church by playing with other boys during a class. Darrius testified that he told Cook about his conversation with Fiona and Chance. According to Chance, Cook never touched him again after Fiona went to the church to speak to Darrius.

In spite of the allegations, the evidence showed that Cook was a trusted family friend and that few believed Chance. Laura testified that she did not believe Chance's allegations because she knew Cook well and that it was "not his character" and because the incidents allegedly occurred at her home. Darrius's sister, Dolly, who had known Cook since she was a little girl, described Cook as an honest, church-going man. Chance's great-aunt, Lucille, who knew Cook for fifteen years, also testified that Cook was an upstanding gentleman and that he never told a lie. Theodus Luckett, III, director of fine arts at the school where Cook worked, testified that he knew Cook for fourteen years, testified that he supervised him at work, and described him as a phenomenal worker who had professional relationships with his students.

Laura, Darrius, and Lucille also believed that Cook lacked an opportunity to abuse Chance at Laura's home. They testified (1) that Cook was never left alone with Chance because there was always someone else at Laura's home after church, (2) that there was a clear line of sight into the living room from the kitchen, and (3) that someone else would have witnessed the abuse had it occurred. Laura added that she only used the restroom when she first returned home from church before others arrived and never used the restroom while guests were in her home. Darrius said that he watched television in the living room every Sunday that he was present and that, if Laura took a nap, she would sleep on the couch in the living room. However, Darrius also testified that he and the bishop were not present every Sunday and that Cook arrived at Laura's house before Darrius on one or two occasions.

5

Several family members also thought that Fiona's husband, Tucker, sexually abused Chance. Tucker was incarcerated during the alleged incident for domestic violence against Fiona. Laura testified that she believed Tucker sexually abused Chance because she was always suspicious of him and because Chance told her that Tucker "messed with" him. Darrius also testified that Chance did not make an allegation against Cook but made one against Tucker instead. During cross-examination, Fiona, who was under suspicion of committing two felony offenses after Chance's allegations were reported, admitted that Tucker recorded himself playing with his own bottom. However, Chance testified in front of the jury that Tucker did not inflict any abuse on him and that Cook was the only person who sexually assaulted him.

Nevertheless, Laura opined that Chance was coached by Fiona to make up the allegations against Cook because she was "a liar[], . . . a manipulator[,] . . . [and] just not right," and Darrius and Lucille, who described Fiona as "a liar, a schemer, and . . . a troublemaker," agreed with that assessment. Dolly also testified (1) that Fiona "like[d] to lie and manipulate" compulsively, (2) that she witnessed Fiona teaching Chance how to lie to obtain government benefits, and (3) that Fiona falsely accused her of sexually touching one of her other sons.

In an attempt to discredit Chance's outcry, Laura made an audio recording of the child several months after the allegations. The audio recording revealed that Laura repeatedly told Chance that Cook loved him and missed him. As a result of Laura's leading questions, Chance denied the allegations and said that Cook only spanked him and that his "momma was the one that started it." When Laura asked Chance if anybody "messed with" him, Chance said that Tucker had.

6

Yet, the Atlanta Police Department (APD) arrested Cook after Chance spoke with Jessica Kelly, a forensic interviewer with the Texarkana Children's Advocacy Center (CAC). Kelly testified that Chance made three allegations of abuse. According to Kelly, Chance said that "somebody at church had been touching him" and that "Cook had made him suck his little thing," which looked like a crayon and "tasted nasty." Kelly explained that "little thing" was Chance's term for penis. Kelly also testified that Chance said that "Mr. Cook put his finger in his bottom" and that it felt hard "on the inside." Kelly told the jury that she looked for signs of coaching, deception, or manipulation, but found "nothing that made [her] to believe that [the] . . . child had been coached or had said something that he did not believe to be true." Kelly described the process of grooming for the jury and explained that predators groom children, their families, and the community.

Kelly also testified that Laura's recording of Chance, which showed the leading nature of Laura's questions, amounted to an improper interview that was not capable of obtaining an unbiased statement. According to Kelly, Chance denied being sexually abused by anyone other than Cook. Jima Hicks, a sergeant with the APD, testified that, while there was no DNA evidence substantiating the allegations, he arrested Cook after Chance said, during his CAC interview, that Cook penetrated his rectum with Cook's finger.

Kaleigh Dodson, Chance's licensed professional counselor, testified that she had many counseling sessions with Chance, who exhibited signs of and was experiencing trauma. Dodson reported that Chance said Cook touched his private parts when he should not have. Dodson testified that Chance brought up Cook on his own during counseling sessions and never mentioned that anyone else touched him. Dodson (1) saw no red flags indicating deception,

7

(2) believed Chance was not faking the trauma symptoms, which were consistently present in his many counseling sessions, and (3) did not think that Chance was being manipulated into making a false accusation. Dodson added that Chance, who had been held back one grade, "was definitely developmentally behind a 7-year-old" and would not have been able to sustain any deception over time given his intellectual stage.

Cook, who had never been convicted or accused of a crime, testified in his defense. Cook said that Chance's home life was horrible and that Cook felt that Chance needed stability in his life from a man that he could look up to. As a result, Cook acted as Chance's caregiver and role model because he was told that the child was not getting much care. Cook admitted that he spanked Chance on the buttocks, but claimed it was with his hand, not a belt. Cook told the jury that Laura was supportive of his role in Chance's life.

Cook denied the allegations, claimed that he was not sexually attracted to boys, and said that Darrius was present every time he went to Laura's home. Cook, who held a doctorate in education and was certified as a principal, admitted that Chance slept in his bed with him twice but told the jury that he saw no problem with sleeping in the same bed with a child he was not related to. Cook opined that Fiona made up the allegations because he spanked Chance.

In rebuttal, the State called Fiona's sister, Arwin, and Fiona's mother, Georgia. Arwin testified that, when Fiona brought Chance to speak with Darrius at the church, Chance was "scared and nervous . . . it's a way [she] had never seen him before." Arwin testified that she believed Chance's allegations, that the child would not lie about something so serious, and that she did not believe that he was coached. Arwin testified that Laura talked with her about the allegations but was most concerned with Cook's reputation, not Chance. Georgia testified that

8

Chance would not lie about the allegations against Cook and that she did not believe Fiona taught him to lie.

After hearing all the conflicting evidence, the jury convicted Cook of three counts of aggravated sexual assault of Chance.

### B.    Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)).  "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented."  *Id.* (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)).  "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'"  *Id.* (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007))).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id.* (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).  "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof

9

or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id*. (quoting *Malik*, 953 S.W.2d at 240).

In this case, the State alleged that Cook "intentionally or knowingly cause[d] the penetration of the anus of Chance Scallion (pseudonym), a child who was then and there younger than 14 years of age, by defendant's finger." *See* TEX. PENAL CODE ANN. § 22.021(a)(1)(B). In companion cause number 06-20-00002-CR, the State alleged that Cook "intentionally or knowingly cause[d] the penetration of the mouth of Chance Scallion (pseudonym), a child who was then and there younger than 14 years of age, by the defendant's sexual organ." In companion cause number 06-20-00003-CR, the State alleged that Cook "intentionally or knowingly cause[d] the sexual organ of Chance Scallion (pseudonym), a child who was then and there younger than 14 years of age, to contact the mouth of the defendant."[4]

### C.    Analysis

Chance, who was younger than fourteen, testified (1) in support of Cook's conviction in this case, that Cook removed his pants and underwear and "put his finger in [his] butt"; (2) in support of Cook's conviction in 06-20-00002-CR, that Cook "made [him] suck his little thing," which was soft and looked like a crayon, with his mouth; and (3) in support of Cook's conviction in 06-20-00003-CR, that Cook "sucked [his] little thing." Chance told the jury that the term "little thing" meant "what [he] use[d] to go to the bathroom . . . number one."

Cook argues that the evidence is legally insufficient because Chance's testimony was not corroborated. However, corroboration of Chance's testimony is not required because "[t]he testimony of a child victim alone is sufficient to support a conviction for aggravated sexual

---

[4]Cook has questioned the legal sufficiency of the evidence in all three cases. For the sake of judicial economy, we address in this opinion whether the evidence was legally sufficient to support Cook's convictions in all three cases.

10

assault." *Scott v. State*, 202 S.W.3d 405, 408 (Tex. App.—Texarkana 2006, pet. ref'd). As a result, Chance's testimony alone was legally sufficient to establish each and every element of the offenses alleged by the State.

Moreover, Fiona testified that Chance pointed to his penis and alleged that Cook sucked it, and according to Hicks, Chance said during the CAC interview that Cook had penetrated Chance's rectum with his finger. Dodson testified that Chance made allegations of sexual abuse against Cook during counseling sessions, and according to Kelly, Chance said Cook had put his "hard" finger "on the inside" of his bottom and made him suck Cook's penis, which looked like a crayon and "tasted nasty."

Even so, Cook argues that the jury's verdict was not rational due to conflicting evidence refuting the plausibility of Chance's allegations and implying the possibility of coaching by Fiona. In other words, Cook wants this Court to re-weigh the evidence. However, "[u]nder a legal sufficiency review, 'our role is not to become a thirteenth juror. This Court may not re-evaluate the weight and credibility of the record evidence and thereby substitute our judgment for that of the fact-finder.'" *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007) (quoting *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999)). As the fact-finder, it was up to the jury to decide whether it believed Chance's testimony that Cook abused him at Laura's house or the testimony addressing lack of opportunity. Because Darrius testified that there were occasions that Cook arrived at Laura's house before him and Chance testified that the abuse happened when Laura was using the restroom, the jury was free to believe Chance. Given Kelly's testimony about the statements Chance made in his CAC interview and Dodson's testimony that Chance consistently referred to Cook during counseling sessions, did not exhibit

11

any signs of coaching, and lacked the intellectual capability to sustain any deception over time, the jury was free to reject the testimony that speculated that Fiona had coached Chance.

Because we find the evidence legally sufficient to support each of Cook's convictions of aggravated sexual assault, we overrule Cook's first point of error.

**II.    While Cook's Counsel Waived His *Batson* Challenge, Harm from the Alleged Ineffective Assistance of Counsel Is Not Shown**

In his second point of error, Cook argues that "the State violated Equal Protection by striking the only Black venireperson within the strike zone" and that the trial court erred in failing to rule on his *Batson* challenge. He also argues that his counsel rendered ineffective assistance by failing to bring a timely *Batson* challenge. We find that the *Batson* challenge is unpreserved, that the trial court did not err in declining to rule on an untimely objection, and that no harm from counsel's alleged ineffective assistance is shown.

**A.    Procedural Background**

After voir dire, the State moved to strike several veniremembers for cause without objection by Cook. After Cook also moved to strike veniremembers for cause, the trial court assessed the panel, as follows:

> THE COURT:  All right.  The Court's going to, has struck . . . No. 3, No. 5, No. 8, No. 12, No. 24, No. 27, No. 28.  That's going to put the strike line at No. 39, so you have ten strikes below -- 39 or below. . . . We'll take the first 13. Everybody good?
>
> [BY THE STATE]:  Thank Your Honor.
>
> [BY THE DEFENSE]:  Yes, Your Honor.

12

The appellate record does not document the peremptory strikes that were made, although it is apparent that the parties exercised preemptory strikes. The record also shows that the jury was seated, and no objections were lodged before it was sworn.

After the jury was sworn, Cook asked to approach the bench and lodged a *Batson* challenge asserting that the State "struck the only African-American juror." The trial court overruled the challenge because it had been waived. Cook's counsel explained that "it was difficult for [him] to stand up and make [a timely] objection prior to the jury being sworn in" because he "was trying to do some research prior to standing . . . at the podium." Cook's counsel did note that the struck juror, A.B., said that "he really didn't want to be [there] . . . [and] was nervous." The State responded that it struck A.B. because he did not want to be there, was "slouching quite a bit, . . . was looking around, [and] . . . did not seem to pay attention" and because it "want[ed] people who [were] going to pay attention." The State also noted that it did not strike "Juror No. 35," an African American who was within the strike zone. Because the issue was waived, the trial court again declined to rule on the *Batson* challenge.

## B. Cook's Counsel Waived His *Batson* Challenge

Cook argues the merits of the *Batson* challenge, but it is not preserved for our review. The Texas Legislature codified *Batson* in Article 35.261 of the Texas Code of Criminal Procedure. *See* TEX. CODE CRIM. PROC. ANN. art. 35.261; *Hill v. State*, 827 S.W.2d 860, 863 (Tex. Crim. App. 1992). The Texas Court of Criminal Appeals has "held that [A]rticle 35.261 was 'intended to create uniform procedures and remedies to address claimed constitutional violations during jury selection.'" *Hill*, 827 S.W.2d at 863 (quoting *Oliver v. State*, 808 S.W.2d 492, 496 (Tex. Crim. App. 1991) (en banc)). "Therefore, whenever a claim is made that

13

veniremembers were peremptorily challenged on the basis of their race, [A]rticle 35.261 must be followed." *Id*.

Article 35.261(a) provides, "After the parties have delivered their lists [of peremptory challenges] to the clerk . . . and before the court has impanelled the jury, the defendant may request the court to dismiss the array and call a new array in the case." TEX. CODE CRIM. PROC. ANN. art. 35.261(a). As a result, for a *Batson* challenge to be timely, it must be made after the parties have delivered their lists of peremptory challenges and "before the court has impanelled the jury." *Id.*; *see Hill*, 827 S.W.2d at 863. "A jury is considered 'impanelled' when the members of the jury have been both selected and sworn." *Hill*, 827 S.W.2d at 864 (citing *Price v. State*, 782 S.W.2d 266 (Tex. App.—Beaumont 1989, pet. ref'd)).

"As a prerequisite to presenting a complaint for appellate review, the record must show that" it "was made to the trial court by a timely request, objection, or motion." TEX. R. APP. P. 33.1(a). Because the record shows that Cook's *Batson* challenge was untimely, the trial court did not err in failing to consider it. *See Hill*, 827 S.W.2d at 864. As a result, we will not address Cook's unpreserved issue on the merits. We overrule this issue.

### C.     Harm from the Alleged Ineffective Assistance of Counsel Is Not Shown

We next address Cook's ineffective assistance claim. As many cases have noted, the right to counsel does not mean the right to errorless counsel. *Robertson v. State*, 187 S.W.3d 475, 483 (Tex. Crim. App. 2006). "[T]o prevail on a claim of ineffective assistance of counsel, [the appellant] must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, [687–88] . . . (1984)." *Ex parte Imoudu*, 284 S.W.3d 866, 869 (Tex. Crim. App. 2009)

14

(orig. proceeding). A failure to make a showing under either prong defeats a claim for ineffective assistance. *See Rylander v. State*, 101 S.W.3d 107, 110–11 (Tex. Crim. App. 2003).

The first prong requires a showing "that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. Under the second prong, a defendant must show that "the deficient performance prejudiced the defense." *Id.* at 687. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* The second *Strickland* prong applies to a claim that counsel rendered ineffective assistance for failing to preserve a *Batson* challenge. *See Batiste v. State*, 888 S.W.2d 9, 16–17 (Tex. Crim. App. 1994).

For purposes of our analysis, we assume that Cook met the first *Strickland* prong and focus on the second. The *Batson* analysis guides our finding that no harm is shown.

*Batson* challenges are subjected to a three-step inquiry. *Purkett v. Elem*, 514 U.S. 765, 767–68 (1995) (per curiam); *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012); *Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999). Under the first step, the person raising a *Batson* challenge is required to "make a *prima facie* showing of racial discrimination." *Nieto*, 365 S.W.3d at 676 (citing *Batson*, 476 U.S. at 96–97); *see Ford*, 1 S.W.3d at 693. Once that prima facie showing is accomplished, the burden shifts to the State to present a racially neutral reason for the challenged jury strike. *Nieto*, 365 S.W.3d at 676 (citing *Batson*, 476 U.S. at 97–98); *Ford*, 1 S.W.3d at 693. Third, once the State's reason is proffered, the burden of persuasion shifts back and the person raising the challenge must then convince the court that the reason given by the State was not race-neutral and was merely pretext for concealing discrimination. *Ford*, 1 S.W.3d at 693 (citing *Purkett*, 514 U.S. at 767–68).

Here, Cook asserts that he made a prima facie showing of racial discrimination by arguing that the State "struck the only African-American juror" within the strike zone. However, this assertion is incorrect. The State noted that it did not strike veniremember number 35, an African American who was also within the strike zone. Next, the State offered race-neutral reasons for striking A.B., including his physical demeanor, which showed that he was not paying attention, and the veniremember's statement that he did not want to be in the courtroom. In response to that reason, Cook offered no argument to support the third step of the *Batson* analysis. As a result, we find that Cook cannot show that he was harmed by his counsel's failure to raise a timely *Batson* challenge. We overrule this point of error.

## III. The Trial Court Did Not Abuse Its Discretion in Overruling Cook's Rule 614 Objection

Next, Cook argues that the trial court erred by allowing Arwin's testimony because it violated the witness sequestration rule, which states, "At a party's request, the court must order witnesses excluded so that they cannot hear other witnesses' testimony." TEX. R. EVID. 614. Because Arwin was neither listed nor expected to be a witness, we find that the trial court did not abuse its discretion in permitting her testimony.

### A. Standard of Review

"We review a trial court's decision to admit or exclude evidence for an abuse of discretion." *Flowers v. State*, 438 S.W.3d 96, 103 (Tex. App.—Texarkana 2014, pet. ref'd) (citing *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010)). "Abuse of discretion occurs only if the decision is 'so clearly wrong as to lie outside the zone within which reasonable people might disagree.'" *Id.* (quoting *Taylor v. State*, 268 S.W.3d 571, 579 (Tex. Crim. App.

16

2008)). "We may not substitute our own decision for that of the trial court." *Id.* (citing *Moses v. State*, 105 S.W.3d 622, 627 (Tex. Crim. App. 2003)). "We will uphold an evidentiary ruling if it was correct on any theory of law applicable to the case." *Id.* (citing *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009)).

### B. Procedural Background

On the second day of trial, the State brought to the court's attention that there was an individual sitting in the back of the courtroom who went in and out of the courtroom several times. The State said, "I'm just concerned that some violation of the rule might have gone on. I don't know, but it seems she's going outside and talking to people." After both the State and Cook said that they did not know who the person was, the trial court had her brought into the courtroom where she was later identified as Fiona's sister, Arwin. The State informed the trial court that it did not list Arwin as a witness and that she was not told that she would be a witness but indicated that it wished to call her in rebuttal as a result of the testimony presented in Cook's defense.

As a result, the following transpired:

[BY THE STATE]: No, we have not admonished her about the Rule. She has been here, but we haven't told her that she had to be here. She showed up, and so whenever she showed up, we decided we might --.

THE COURT: Okay. So you have not identified her as a witness?

[BY THE STATE]: No.

THE COURT: She's just a citizen who's concerned, who somehow has touched this case and is here in the courthouse. Is that correct?

[BY THE STATE]: Possibly, yes, Your Honor. Your Honor, I'm not -- I don't want to call her if there's been some rule violation, but it is true, yes, that I

17

never told her that she is a witness. I didn't -- she's not here because I told her to be here.

[BY THE DEFENSE]: Defense would object strenuously to that, Judge.

THE COURT: What's your objection?

[BY THE DEFENSE]: Well, my objection is that her testimony's been tainted, if they're going to call her as a rebuttal witness.

[BY THE STATE]: Well, we just need to clear this up because I don't know if there's been any communication.

THE COURT: All right. Ma'am, if I could ask you to come -- in the black shirt, yes, ma'am, what's your name?

UNIDENTIFIED WOMAN: [Arwin].

THE COURT: All right. You've come in and out of the courtroom a couple of different times this morning. Is -- have you been listening to the testimony and then telling somebody else about what's going on in the courtroom?

[ARWIN]: No, sir. Reason why I'm coming in and out is because that's my nephew, and that -- like that hurts, so you know, I take a minute and then I come back. That's it.

. . . .

THE COURT: Okay. And I'm just trying to find out whether you've been talking to anybody outside the courtroom about what's been going on inside the courtroom.

[ARWIN]: No, sir.

When the State called Arwin in rebuttal, Cook objected that she had been in the courtroom and "heard a lot of the testimony." The trial court overruled the objection and found the following: "[W]hile she's been in and out of the courtroom a couple of times today, she's not -- was not present yesterday. She was, like we said, in and out, and it appeared to me that she was only in

18

and out one, maybe two witnesses at the most." The trial court also said that Cook could "cross-examine her on what she may have heard" and whether it "would affect her testimony."

## C.   Analysis

We review a trial court's admission of testimony from a witness who has violated Rule 614 under an abuse-of-discretion standard. *Guerra v. State*, 771 S.W.2d 453, 474 (Tex. Crim. App. 1988); *see Harris v. State*, 122 S.W.3d 871, 882 (Tex. App.—Fort Worth 2003, pet. ref'd).

In *Guerra*, the Texas Court of Criminal Appeals set forth a two-step process for determining whether the trial court abused its discretion in allowing testimony in violation of the Rule. *Guerra*, 771 S.W.2d at 475–76; *see Harris*, 122 S.W.3d at 882 (citing *Minor v. State*, 91 S.W.3d 824, 829 (Tex. App.—Fort Worth 2002, pet. ref'd)); *see also Loven v. State*, 831 S.W.2d 387, 399 (Tex. App.—Amarillo 1992, no pet.). "The first step of the analysis requires us to determine what kind of witness was involved." *Harris*, 122 S.W.3d at 882 (citing *Guerra*, 771 S.W.2d at 476). The first category is a witness "who had no connection with either the State's case-in-chief or the defendant's case-in-chief and who, because of a lack of personal knowledge regarding the offense, was not likely to be called as a witness." *Guerra*, 771 S.W.2d at 476. There is no abuse of discretion when this category of witness is allowed to testify. *Id.*; *see Webb v. State*, 766 S.W.2d 236, 240 (Tex. Crim. App. 1989); *Harris*, 122 S.W.3d at 882; *Minor*, 91 S.W.3d at 830; *Loven*, 831 S.W.2d at 399.

The second category of witness is "one who had personal knowledge of the offense and who the party clearly anticipated calling to the stand." *Guerra*, 771 S.W.2d at 476; *see Harris*, 122 S.W.3d at 882, *Minor*, 91 S.W.3d at 830; *Loven*, 831 S.W.2d at 399. If the witness is a category two witness, then we proceed to the second step, which requires "us to determine

19

whether the witness actually conferred with or heard the testimony of another witness" and "whether the witness's testimony contradicted the testimony of a witness [she] actually heard from the opposing side or corroborated the testimony of another witness [she] actually heard from the same side on an issue of fact bearing upon the issue of guilt or innocence." *Harris*, 122 S.W.3d at 882–83 (citing *Guerra*, 771 S.W.2d at 475). On the other hand, if the witness is of the first category, we need not consider the second step. *See Guerra*, 771 S.W.2d at 476.

Cook's argument presumes that Arwin was a category two witness. We disagree. Although Arwin was present when Fiona brought Chance to the church to speak with Darrius, she had no personal knowledge of the offense, "was not present during the commission of the offense[,] and thus could shed no light on appellant's involvement." *See Guerra*, 771 S.W.2d at 476. The record shows that neither the State nor Cook anticipated that Arwin would be a witness. As a result, we find that Arwin was a category one witness and that the trial court did not abuse its discretion in allowing her to testify. We overrule this remaining point of error.

## IV. Conclusion

Having overruled the merits of Cook's remaining grounds following remand from the Texas Court of Criminal Appeals, we affirm the trial court's judgment.

Charles van Cleef
Justice

Date Submitted:     February 22, 2023
Date Decided:       March 10, 2023

Do Not Publish