

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-22-00085-CR

---

KEVIN DEWAYNE SHEPARD, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 5th District Court
Cass County, Texas
Trial Court No. 2020F00207

---

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Justice Rambin

# MEMORANDUM OPINION

Margaret Thomas testified that she witnessed Kevin DeWayne Shepard, Jr., kill Cynthia Renae Arnold and Donnie Monroe Combs and dispose of their bodies by fire. After hearing Thomas's testimony, a Cass County jury convicted Shepard of capital murder. Following a bench trial on punishment, the trial court sentenced Shepard to life imprisonment, without the possibility of parole, and ordered him to pay $562.00 in court costs.

On appeal, Shepard argues that Thomas was his accomplice, that there was insufficient corroboration of Thomas's testimony, and that, as a result, he was egregiously harmed by the trial court's failure to include an accomplice-witness instruction in the jury charge. Shepard also argues that the trial court erred by allowing Arnold's daughter, Laura, to testify after she allegedly violated the witness sequestration rule and that the judgment imposed unauthorized court costs.

We conclude that neither corroboration of Thomas's testimony nor an accomplice-witness instruction was required because Thomas was not an accomplice to Shepard's crime. We also find that Shepard was unharmed by Laura's testimony but conclude that court costs must be reduced. As a result, we modify the trial court's judgment and bill of costs to reduce the court costs assessed and affirm the judgment, as modified.

## I. Factual Background

The evidence at trial showed that methamphetamine fueled the victim's final interaction with Shepard. Laura described Arnold as a great mother who never consumed alcohol or drugs until she experienced a divorce and lost her job. According to Laura, Arnold "developed a drug

addiction, fairly overnight." Laura testified that Arnold started using methamphetamine when she was almost forty but remained close to her three children and spoke to Laura "very regularly." Arnold began dating Combs who, according to his mother, also struggled with a methamphetamine addiction and smoked marihuana.

Laura testified that she last spoke with Arnold on September 25, 2018, and soon became concerned after discovering that no one else in the family had spoken to her since. To locate Arnold, Laura contacted Combs's family, realized they had filed a missing person report for Combs, and decided to file a missing person report for Arnold. Combs's mother said she knew something was awry because Combs lived behind her home but never returned after September 25. Elizabeth Buhay, a telecommunication crime analyst with the Texas Department of Public Safety (TDPS), testified that the last outgoing activity from Arnold's cellphone occurred on September 25 at 11:52 p.m., and the last outgoing activity from Combs's cellphone was at 12:21 a.m. on September 26. A search for the missing couple ensued.

On September 30, Elisha Riehl, a sergeant with the Marion County Sheriff's Office, was dispatched to the scene of a burning red truck on a remote county road. Riehl found it unusual that the driver's side door was open, white spray paint was haphazardly applied above the back driver's side tire, and the fire had burned hot for so long that the truck's rims had melted to the road. Photos of the charred truck showed that "[t]here wasn't anything left in the cab of the truck" except for twisted metal and ash. Because the license plate was intact, Riehl soon confirmed that the truck belonged to Arnold, but it contained no clue as to Arnold's or Combs's whereabouts.

News spread of the search and on October 29, 2018, Gracie Beeler called the police to report suspicious items found on her property. Beeler reported that the items might belong to the missing persons. Chad Wilder, a deputy with the Cass County Sheriff's Office, went to Beeler's property. Beeler found a metal feed bucket, a saw blade, white cloth gloves, a pair of brown leather cowboy boots with unique tan stitching, and a Mitchell & Ness, adjustable-fit baseball cap that "had all been burnt."

Texas Ranger Joshua Mason testified that he was commissioned to assist the Cass County Sheriff's Office with the missing persons investigation. He also spoke with Beeler on October 29, 2018, although apparently at separate times.[1] According to Mason, Beeler said that Shepard rented a trailer located on her property quite a distance from her home. Mason described Beeler as being initially hesitant to provide information because she was scared of Shepard. Beside the trailer, Mason saw a "burn pit [with] . . . a hole that [wa]s the size of a small room," but Mason's visual examination yielded nothing except for a wheelbarrow that had little significance to Mason at the time. The physical evidence did not yield a DNA match.[2] Mason would go on to make several trips to Beeler's property, among them was a December 2018 trip during which Mason took aerial photographs of the area.

In speaking to others in the area about Shepard, Mason heard a rumor that Shepard decided to retaliate against Combs because he had talked to the police about Shepard's uncle, Gary Shepard, who was arrested for theft of heavy equipment.

---

[1] Mason testified that "[t]he [C]ounty had already been out there at some point . . . ."

[2] Kristen Cossota, a crime laboratory analyst with the TDPS, performed DNA analysis of the cloth gloves, boot, and baseball cap, but reported that there was insufficient data to reach any conclusion.

4

It was not until July 1, 2019, that Mason received a call from a Dallas County investigator who reported that a recent arrestee, Thomas, told someone that Arnold and Combs were dead and that she had witnessed their murder. Mason interviewed Thomas, who said that Arnold and Combs "were killed [with firearms] and put in the burn pit and burned, completely burned" by Shepard. Mason did not believe that Thomas had a part in Arnold's or Combs's death and found Thomas to be credible based on her account, which included several details that were not disclosed to her. For example, according to Mason, Thomas said Shepard had used a wheelbarrow to transport Arnold's body to the burn pit and that Shepard had burned his boots in a bucket. She described the vehicle used by Arnold and Combs as a "maroon, single-cab pickup truck" and said Shepard had tried to change the appearance of the truck by using spray paint. In Mason's estimation, Thomas's account "fill[ed] in the blanks." As a result of the interview, Mason decided to return to Beeler's property again.

An initial dig of the burn pit revealed no evidence. As a result, the Federal Bureau of Investigation became involved. Dianna Strain, a former special agent for the FBI and a forensic evidence specialist was tasked with completing a "sifting operation of a burn pit" in the summer of 2020. Strain found bone fragments, bullet casings, wheelbarrow parts, and an earring and sent the items to the FBI laboratory in Quantico.

Richard Thomas, a forensic examiner at the FBI laboratory, received the bones from the burn pit, which all showed "postmortem damage from . . . heat." Richard testified that he identified a radius bone fragment, scaphoid bone, distal first metatarsal, and distal phalanx as decidedly human, and a cranial fragment and portion of a right third metacarpal consistent with

5

human anatomy. Because of the size and conditions of the bone, Richard was unable to determine if the human bones were of male or female origin. Amy Quila, a firearms and toolmarks examiner at the FBI laboratory, received 300 cartridge casings from the burn pit matching "eleven different types of firearm[s] that these cartridges were designed to be fired in." As for the earring, Arnold's daughter, Madeline Carol, testified that the jewelry belonged to Arnold.

Thomas testified that she met and befriended Shepard in September 2018. Even though their friendship was new, Thomas went toward the end of the month with Shepard to a trailer he rented from Beeler to get high on methamphetamine. Thomas testified that the trailer was "out in the country" in an area that was heavily forested.[3] Thomas testified that the trailer had "a bunch of old stuff in it" and looked abandoned. Photos of the trailer, which were admitted into evidence, showed that there was a mattress in one of the rooms, but otherwise, there was no furniture. There was no electricity and no running water. According to Thomas, Shepard, who always carried a firearm on his person, took Thomas's phone and pulled it apart after informing her that she would not need it. Thomas testified that she and Shepard spent approximately one week in the trailer bingeing on drugs.

Thomas said that Arnold and Combs, who knew Shepard because Combs worked for Shepard's uncle, joined them in the trailer on more than one occasion to get high on methamphetamine. Thomas identified Arnold's truck as the one that transported the couple to

---

[3]Wilder testified that the Beeler property was in a "wooded, wooded area" that was "probably approximately twelve, thirteen miles from any city." On cross-examination, Wilder conceded that there was a nearby "community" of Bivins. In any event, the closest homes to the trailer were approximately five hundred yards away.

the trailer. She said that, on a "late evening," Shepard and Combs were building a fire in the burn pit and shooting guns when Arnold excused herself from the group, retreated to her truck to sleep, and left the truck door open. Thomas tearfully testified that, while the boys were shooting guns, "[Shepard] said, 'Watch this,' and he shot into the truck, and [Arnold] fell over." According to Thomas, Shepard turned toward Combs and said, "I've got something for you too." He then shot Combs. Combs initially fell but got up and ran, prompting Shepard to chase him. When Thomas heard gunshots, she knew the chase had ended. Thomas testified she did nothing because she was scared and in shock.

According to Thomas, Shepard explained that he killed Combs for his uncle who "was looking at doing time because [he and Combs had] done some dirty work together" and Combs "had snitched." Thomas said Shepard returned to the trailer with a carpet and asked her to help him collect Combs. After Thomas refused to help, Shepard drug a rolled carpet containing Combs's body and tossed it into the blazing burn pit. Thomas watched in horror as Shepard retrieved Arnold's body from her truck using a wheelbarrow, rolled her into the burn pit, and piled more trash into the fire. According to Thomas, Shepard stoked and tended to the fire for the rest of the night and into the following morning.

Thomas said that, on the following day, Shepard asked her to search the burn pit for bones and teeth, but she refused the request. According to Thomas, Shepard assumed the task himself, sifted through the burn pit, and placed into a cooler anything he believed to be human remains.

7

Shepard then turned his attention to removing Arnold's truck from the scene. He spray painted Arnold's truck in a failed attempt to disguise it, then asked Thomas to get in his car so she could follow him as he disposed of Arnold's truck. Thomas complied with that request because she was afraid Shepard would hurt her. Thomas considered driving away in Shepard's car but decided not to attempt escape because Shepard knew where her family lived, and she was scared for their safety. Thomas testified that she witnessed Shepard park Arnold's truck on a remote country road, pour gasoline over it, and set it on fire. Thomas confirmed that she did not get out of Shepard's car to help in any way and said they drove back to the trailer afterward. Once they were back on Beeler's property, Thomas overheard Shepard tell someone, "It's done," over the phone and assumed he was talking to his uncle. Thomas said Shepard took off his clothes, placed his cowboy boots and hat into a bucket, and lit them on fire.

After the crime, Shepard told Thomas that he had a job in Oklahoma and drove them there. Thomas testified that she lived with Shepard in Oklahoma and started a job at Pizza Hut. She was able to use Shepard's phone, but never told anyone about the murders out of fear. Thomas testified that a casual observer would believe they were dating and admitted she would "tell him things that [she] thought he'd want to hear because [she] didn't want him to" kill her too. After months of quiet, Shepard returned Thomas to Texas and introduced her to a woman Thomas believed was Shepard's wife. The woman eventually dropped Thomas off in Dallas, where she was arrested.[4]

---

[4]The record does not specify the crime for which Thomas was arrested.

Thomas testified that she could no longer cope with the weight of what she had witnessed and revealed information about the murders to a "lady at the jail that was teaching [her] religion classes." Thomas spoke to Mason on two occasions and was offered immunity from the district attorney after she agreed to cooperate with authorities. Thomas clarified that she had stopped using methamphetamine after Shepard murdered the couple, had been sober for three years by the time of the June 2022 trial, and had maintained steady employment.

The only witness called by Shepard was Mason. Mason was questioned about Thomas's social media messages. Specifically, Mason was questioned about whether Thomas, in her initial interview with Mason, had been forthcoming about her access to guns while in the presence of Shepard and about whether Thomas's social media messages contradicted Thomas's testimony that she was just "going through the motions" with Shepard following the murders. Mason testified that he did not believe that Thomas was involved in the actual shootings.

After hearing the evidence, the jury convicted Shepard of capital murder.

## II. Thomas Was Not an Accomplice Witness

"An accomplice is an individual who participates with a defendant before, during, or after the commission of the crime and acts with the requisite culpable mental state." *Cocke v. State*, 201 S.W.3d 744, 748 (Tex. Crim. App. 2006) (citing *Paredes v. State*, 129 S.W.3d 530, 536 (Tex. Crim. App. 2004)). Shepard's first two points of error on appeal assume that Thomas was an accomplice witness. Specifically, Shepard argues that there was insufficient corroboration of Thomas's testimony and that he was egregiously harmed by the trial court's failure to include an

accomplice-witness instruction in the jury charge. Because we find that Thomas was not an accomplice to Shepard's crime, we overrule his first two points of error.

"Texas law requires that, before a conviction may rest upon an accomplice witness's testimony, that testimony must be corroborated by independent evidence tending to connect the accused with the crime." *Druery v. State*, 225 S.W.3d 491, 498 (Tex. Crim. App. 2007). Also, because "a defendant has a right to an instruction on any defensive issue raised by the evidence," a defendant is entitled to an accomplice-witness instruction to "remind[] the jury that it cannot use the accomplice's testimony to convict the defendant unless there also exists some non-accomplice testimony tying the defendant to the offense." *Cocke*, 201 S.W.3d at 747 (citing *Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002)). "If the evidence presented by the parties is conflicting and it remains unclear whether the witness is an accomplice, the trial judge should allow the jury to decide whether the inculpatory witness is an accomplice witness as a matter of fact under instructions defining the term 'accomplice.'" *Druery*, 225 S.W.3d at 498–99.

However, neither corroboration nor an accomplice-witness instruction is required "when the evidence is clear that the witness is neither an accomplice as a matter of law nor as a matter of fact." *Cocke*, 201 S.W.3d at 748 (citing *Gamez v. State*, 737 S.W.2d 315, 322 (Tex. Crim. App. 1987) ("If a State's witness has no complicity in the offense for which an accused is on trial, . . . her testimony is not that of an accomplice witness whatever may have been h[er] complicity with the accused in the commission of other offenses.")); *see Druery*, 225 S.W.3d at 498. To determine whether corroboration of Thomas's testimony is required or whether the trial

court was required to give an accomplice-witness instruction in this case, we must examine the record to decide whether Thomas was Shepard's accomplice either as a matter of law or as a matter of fact.

"[A] witness is an accomplice as a matter of law in the following" three circumstances: (1) "[i]f the witness has been charged with the same offense as the defendant or a lesser-included offense," (2) "[i]f the State charges a witness with the same offense as the defendant or a lesser-included of that offense, but dismisses the charges in exchange for the witness's testimony against the defendant" or (3) "[w]hen the evidence is uncontradicted or so one-sided that no reasonable juror could conclude that the witness was not an accomplice." *Ash v. State*, 533 S.W.3d 878, 886 (Tex. Crim. App. 2017); *see Davison v. State*, 602 S.W.3d 625, 643 (Tex. App.—Texarkana 2020, pet. ref'd); *Phelps v. State*, 532 S.W.3d 437, 442 (Tex. App.—Texarkana 2017, pet. ref'd). Here, because Thomas was never charged with any crime in connection with the murders and the evidence did not strongly establish that Thomas was an accomplice to the murders, as opposed to a bystander, she was not an accomplice as a matter of law.

As a result, we must examine whether Thomas was an accomplice as a matter of fact, which requires us to review the record for evidence that she participated with Shepard "before, during, or after the commission of the crime and act[ed] with the requisite culpable mental state," regardless of whether she was charged or prosecuted for the participation. *Cocke*, 201 S.W.3d at 748 (citing *Paredes*, 129 S.W.3d at 536). "Participation requires an affirmative act that promotes the commission of the offense with which the defendant is charged." *Id.* (citing *Paredes*, 129

11

S.W.3d at 536).  For this reason, "[m]ere presence at a crime scene does not make an individual an accomplice, nor is an individual an accomplice merely because [s]he has knowledge about a crime and fails to disclose that knowledge."  *Id.* (citing *Blake v. State*, 971 S.W.2d 451, 454 (Tex. Crim. App. 1998) ("[O]ne is not an accomplice for knowing about a crime and failing to disclose it, or even concealing it.")); *see Easter v. State*, 536 S.W.2d 223, 229 (Tex. Crim. App. 1976) (acting only as an accessory after the fact does not alone make a witness an accomplice). Also, "[t]hat the individual is complicit with the accused in committing an offense other than the one charged is insufficient to make him or her an accomplice."  *Evens v. State*, 476 S.W.3d 743, 746 (Tex. App.—Texarkana 2015, pet. ref'd).   "Rather, there must be affirmative proof establishing the . . . witness willingly participated in the act . . . upon which the prosecution is based."  *Phelps*, 532 S.W.3d at 449 (citing *Druery*, 225 S.W.3d at 498 ("To be considered an accomplice witness, the witness's participation with the defendant must have involved some affirmative act that promotes the commission of the offense with which the defendant is charged.")).

It comes down to this: as the culpable mental state standard requires, Shepard asserts that "a fact[-]finder could determine that Thomas acted with the intent to commit the murders."  We disagree.  Nothing supports a finding that Thomas intended to assist in the murders of Arnold and Combs.  Therefore, there was no error by the trial court; an accomplice witness instruction was not required.

This holding is bolstered by its similarity to the facts of *Druery*, which supports our analysis in this case.  Marcus Druery was convicted of murdering Skyyler Browne, a known drug

12

dealer that was carrying drugs, cash, and a gun at the time of his death. *Druery*, 225 S.W.3d at 495–96. At trial, Joquisha Pitts testified that Druery and Browne picked her up and also picked up Marcus Harris, along with some drugs, on their way to a club. *Id.* at 496. After leaving the club, the group headed to a rural property owned by Druery's family, where the group took turns shooting guns at bottles thrown into a stock pond. *Id.* Druery told Pitts and Harris that he was going to kill Browne because he "wanted [Browne's] 'stuff,'" but they thought "Druery was 'tripping' on embalming fluid that he had smoked." *Id.* When Druery shot Browne, Pitts and Harris cried and screamed, causing Druery to attempt to calm them by giving them forty dollars each. *Id.* Druery poured gasoline over Browne's body, set him ablaze, and instructed Pitts and Harris on how to respond to any questions about Browne's whereabouts. *Id.* at 496–97. The following day, Druery and Pitts returned to the scene, burned Browne's body a second time, and threw his remains in the pond. "Harris assisted Druery in disposing of the murder weapon." *Id.* at 497. Eventually, Pitts reported the incident to police. *Id.* Both Pitts and Harris said they were afraid of Druery. *Id.*

Druery argued that Pitts and Harris were accomplices because they knew he was going to kill Browne but did nothing to warn Browne, they assisted Druery after the murder, and they kept the money Druery gave them. Given the facts in *Druery*, the Texas Court of Criminal Appeals determined that neither Pitts nor Harris were accomplice witnesses as a matter of law or fact. *Id.* at 499. The court reasoned that their presence at the scene did not make them accomplices, that "neither Pitts nor Harris [were] accomplice witness[es] merely because [they] knew of the planned offense but did not disclose it," and that assisting Druery, after the fact, did

13

not transform them into accomplice witnesses for the murder. *Id.* at 500. As a result, the Texas Court of Criminal Appeals concluded that the "evidence d[id] not indicate that either Pitts or Harris performed any affirmative act to assist in the commission of the capital murder or a lesser-included offense of the capital murder." *Id.* at 499–500.

In this case, Thomas had even less culpability than Pitts and Harris did in *Druery*. For example, nothing in the record showed that Thomas had any indication that Shepard intended to murder Arnold or Combs. There was no evidence at trial showing that she was anything other than an onlooker who happened to be present during the murders and incineration of Arnold's and Combs's bodies. While she assisted Shepard in disposing of Arnold's truck, Thomas testified she complied out of fear, and even if she had intended to assist Shepard in tampering with evidence, it did not establish that she acted with intent to promote capital murder or a lesser-included offense since that crime was already complete. Even though Thomas moved to Oklahoma with Shepard and failed to disclose the crime for many months, those facts "did not transform [her] into an accomplice witness[]" for the murder of Arnold or Combs. *Id.* at 500.

As in *Druery*, the facts in this case do not suggest that Thomas performed any act to assist Shepard in committing capital murder or any lesser-included offense of capital murder. Because this finding is dispositive of Shepard's first two points of error on appeal, we overrule them.

## III.    Shepard Was Not Harmed by Admission of Arnold's Daughter's Testimony

In his third point of error, Shepard argues that the trial court erred by admitting Carol's statement that an earring found in the burn pit belonged to her mother. According to Shepard,

14

Carol should have been silenced under the witness-sequestration rule, commonly referred to simply as "the Rule." TEX. R. EVID. 614. Even assuming error, we find that Shepard was unharmed by Carol's testimony.

Our review of the record shows that the Rule was invoked by the State but that the State and the defense had agreed to exempt "family members of the victims that [were] testifying as to . . . the identity of who their loved ones, the victims, [were]," including Carol. Defense counsel stated that he had no objection to exempting Carol from the Rule based on that agreement, and as a result, Carol remained in the courtroom during much of the State's case-in-chief. Yet, when Carol was called to identify her mother's jewelry, defense counsel objected because Carol's exemption from the Rule was premised on the understanding that "they weren't going to talk about any type of evidentiary value." After the trial court said that "the rule was invoked previously with an agreement of parties that the family members could stay in as long as their testimony was limited to identification," the State withdrew further questioning of Carol at that time, but she was later recalled and testified that the earring found in the burn pit belonged to her mother, over Shepard's objection.

Because of the unique facts of this case, we assume error, with a brief explanation of why we are doing so. Appellate courts review a trial court's admission of testimony from a witness who has violated Rule 614 under an abuse-of-discretion standard. *Guerra v. State*, 771 S.W.2d 453, 474 (Tex. Crim. App. 1988); *Harris v. State*, 122 S.W.3d 871, 882 (Tex. App.—Fort Worth 2003, pet. ref'd). Here, Carol was exempted from the Rule by agreement, but with an

understanding that she would not testify to anything that had substantive evidentiary value. As a result, the typical analysis here is skewed.

For example, in *Guerra*, the Texas Court of Criminal Appeals set forth a process for determining whether the trial court abused its discretion in allowing testimony in violation of the Rule, but the facts here do not squarely fit into that process. *Guerra*, 771 S.W.2d at 475–76; *see Harris*, 122 S.W.3d 882. The first step of the process requires us to determine what kind of witness was involved among two categories, but Carol has one foot in both categories. *Harris*, 122 S.W.3d at 882 (citing *Guerra*, 771 S.W.2d at 476).

The first category is a witness "who had no connection with either the State's case-in-chief or the defendant's case-in-chief and who, because of a lack of personal knowledge regarding the offense, was not likely to be called as a witness." *Guerra*, 771 S.W.2d at 476. There is no abuse of discretion when this category of witness is allowed to testify. *Id.*; *Webb v. State*, 766 S.W.2d 236, 240 (Tex. Crim. App. 1989); *see Harris*, 122 S.W.3d at 882. The second category of witness is "one who had personal knowledge of the offense and who the party clearly anticipated calling to the stand." *Guerra*, 771 S.W.2d at 476; *see Harris*, 122 S.W.3d at 882, *Minor v. State*, 91 S.W.3d 824, 830 (Tex. App.—Fort Worth 2002, pet. ref'd); *Loven v. State*, 831 S.W.2d 387, 399 (Tex. App.—Amarillo 2002, no pet.). If the witness is a category-two witness, certain steps are required to determine whether a defendant was harmed by the admission of the witness's testimony. Like a category-one witness, Carol had no personal knowledge of the offense but, like a category-two witness, was expected to testify since she was

16

listed as a witness in the State's case-in-chief. As a result, we assume error and move to a harm analysis.

Shepard's brief applies a harm analysis under Rule 44.2(b) of the Texas Rules of Appellate Procedure, which we believe is the proper measure for harm instead of the typical analysis applied to violations of the Rule. Typically, "[i]njury to the defendant is shown" for a Rule 614 violation if "the witness actually conferred with or heard testimony of other witnesses" and "the witness'[s] testimony contradicted testimony of a witness from the opposing side or corroborated testimony of a witness with whom he or she had conferred or heard." *Bryant v. State*, 282 S.W.3d 156, 161–62 (Tex. App.—Texarkana 2009, pet. ref'd) (quoting *Wilson v. State*, 179 S.W.3d 240, 248 (Tex. App.—Texarkana 2005, no pet.); *see Franklin v. State*, 459 S.W.3d 670, 680 (Tex. App.—Texarkana 2015, pet. ref'd). "If both prongs are met, then the error 'most likely resulted in harm.'" *Franklin*, 459 S.W.3d at 680 (quoting *Allen v. State*, 436 S.W.3d 815, 822 (Tex. App.—Texarkana 2014, pet. ref'd)). This type of harm analysis is specifically designed to address an express violation of the Rule by a category two witness. Here, however, Carol was exempted from the Rule, but her testimony simply exceeded the scope of the agreement that allowed her to remain in the courtroom. As a result, whether she heard testimony from other witnesses should have no bearing on the harm analysis in this case, and evaluating harm based on whether she contradicted or corroborated testimony makes little sense.

Moreover, non-constitutional error is disregarded unless the defendant's substantial rights were affected. TEX. R. APP. P. 44.2(b); *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). Thus, "we need not reverse if, after examining the record as a whole, we have fair

17

assurance that the error did not influence the jury's deliberations to appellant's detriment or had but a slight effect." *Franklin*, 459 S.W.3d 670, 681 (quoting *Allen*, 436 S.W.3d at 824 (quoting *Ladd v. State*, 3 S.W.3d 547, 566 (Tex. Crim. App. 1999))).

Here, we conclude that Carol's answer to a single question—that the earring belonged to her mother—had but a slight effect, if any, on the jury's verdict. Because she was not present during the crime and had no information about how it occurred, the jury knew that Carol had no personal knowledge of the offense. The fact that Arnold's earring was found, alone, was not directly probative of whether Shepard had murdered Arnold and Combs. Also, because the earring had a common design and was highly damaged and discolored, the weight of Carol's testimony was lower than the weight it would have carried had the earring been of a unique design or color. As a result, Carol's testimony did not have high evidentiary value.

Moreover, by the time Carol testified, the jury had already heard ample evidence from other sources supporting Shepard's conviction. The jury heard that both Arnold and Combs went missing around September 25, 2018, and Buhay testified that the last outgoing calls from their cellphones were made around that time. Wilder testified to the remoteness of the area. He also testified that Beeler had reported suspicious items on her property, items that she thought might belong to the victims. Mason had testified that he was called in to assist in the search for Arnold and Combs and to investigate the nature of their disappearance. Mason testified that registration records showed the burned pickup belonged to one of the victims and opined that those circumstances indicated foul play. Mason said his investigatory interviews revealed "rumors" or "street talk" linking Combs to Shepard and Shepard to Beeler's property and

18

provided potential motive for Shepard to harm Combs. Beeler confirmed to Mason that Shepard was indeed her renter at the time Arnold and Combs disappeared. Thomas testified that Shepard shot Arnold and Combs and burned their bodies. She detailed the events occurring before, during, and after the murders. The evidence showed that the burn pit next to the trailer Shepard had rented contained parts of a wheelbarrow, which was consistent with Thomas's statement that Shepard used a wheelbarrow to transport Arnold into the pit after her murder. Most importantly, the burn pit contained human remains. Given this highly incriminating evidence, we find that Shepard's substantial rights were not affected by Carol's testimony and overrule his third point of error on appeal.

## IV.    Court Costs Must Be Reduced

In his last point of error, Shepard argues that the assessment of $562.00 in court costs must be reduced. We agree.

The trial court imposed the following court costs:

| | |
|---|---|
| STATE CONSOLIDATED COURT COST-2020 | 185.00 |
| LOCAL FEES: | |
| CLERKS FEE 2020 | 192.00 |
| COUNTY RECORDS MANG & PRESER FD2020 | 25.00 |
| COUNTY JURY FUND-2020 | 1.00 |
| COURTHOUSE SECURITY FUND | 10.00 |
| C & D COURT TECH FUND-2020 | 4.00 |
| COUNTY SPECIALITY COURT ACCT-2020 | 25.00 |
| TIME PAYMENT REIMBURSEMENT FEE-2020 | 15.00 |
| SHERIFFS REIMBURSEMENT FEE -2020 | 105.00 |
| TOTAL COST OF CAUSE | 562.00 |

"[W]e review the assessment of court costs on appeal to determine if there is a basis for the cost . . . ." *Johnson v. State*, 423 S.W.3d 385, 390 (Tex. Crim. App. 2014).

In 2019, the Texas Legislature passed an Act, which we refer to as the Cost Act, relating to the consolidation and allocation of state criminal court costs, which increased the amount of some court costs and reduced the amounts of other court costs. *See* Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 1.05, sec. 134.101, 2019 Tex. Gen. Laws 3981, 3984–85 (codified at TEX. LOC. GOV'T CODE § 134.101). The Cost Act took effect on January 1, 2020, and provided,

> Except as otherwise provided by this Act, the changes in law made by this Act apply only to a cost, fee, or fine on conviction for an offense committed on or after the effective date of this Act. An offense committed before the effective date of this Act is governed by the law in effect on the date the offense was committed, and the former law is continued in effect for that purpose.

Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 5.01, 2019 Tex. Gen. Laws 3981, 4035. Because Shepard's offense was committed in 2018, we apply the law in effect at that time and examine each item assessed in the bill of costs.

The first item in the bill of costs is a state consolidated court cost of $185.00. The Cost Act increased that fee from $133.00 to $185.00. Act of May 23, 2019, 86th Leg., R.S., ch. 1352, § 1.03, 2019 Tex. Gen. Laws 3981, 3982 (codified at TEX. LOC. GOV'T CODE § 133.102). Because the Cost Act did not apply to the 2018 offense, the State concedes that the state consolidated court costs should be $133.00 instead of $185.00.

With respect to local fees, based on the fee statutes in effect in 2018, the State concedes that the clerk's fee should be $40.00 instead of $192.00 and that the county specialty court account fee should be deleted. *See* Act of May 28, 2005, 79th Leg., R.S., ch. 804, § 4, sec.

102.041(2), 2005 Tex. Gen. Laws 2775, 2776 (effective June 17, 2005). Of the remaining local fees that were assessed, the allowable amounts for those fees in 2018 were (1) $25.00 for records management and preservation services,[5] (2) $5.00 for the security fund fee,[6] (3) $4.00 for the jury fund fee,[7] and (4) $4.00 for the county and district court technology fund fee.[8,9]

Next, the bill of costs contains a $15.00 time payment fee. *See* TEX. CODE CRIM. PROC. ANN. art. 102.030 (Supp.). The Texas Court of Criminal Appeals has concluded that a time payment fee like the one imposed here "must indeed be struck for being prematurely assessed because a defendant's appeal suspends the duty to pay court costs and therefore suspends the running of the clock for the purposes of the time payment fee." *Dulin v. State*, 620 S.W.3d 129, 129 (Tex. Crim. App. 2021). "As a consequence, even now, assessment of the time payment fee in this case would be premature because appellate proceedings are still pending." *Id.* The State concedes that, pursuant to *Dulin*, the time payment fee should be struck without prejudice.

The last fee in the bill of costs is the sheriff reimbursement fee. In challenging this fee, Shepard makes a single-line argument that "Texas law does not currently appear to support the

---

[5]Act of May 28, 2005, 79th Leg., R.S., ch. 804, § 2, 2005 Tex. Gen. Laws 2775, 2775–76 (effective June 17, 2005).

[6]Act of May 22, 1993, 73d Leg., R.S., ch. 818, § 1, art 102.017(a), 1993 Tex. Gen. Laws 3258, 3258 (effective Sept. 1, 1993).

[7]Act of May 27, 2005, 79th Leg., R.S., ch. 1360, § 5, art. 102.0045(a), 2005 Tex. Gen. Laws 4255, 4256 (effective Sept. 1, 2005).

[8]Act of May 31, 2009, 81st Leg., R.S., ch. 1183, § 1, art. 102.0169(a), 2009 Tex. Gen. Laws 3753, 3753 (effective September 1, 2009).

[9]The State seeks to add additional fees that were not assessed by either the bill of costs or the trial court's judgment. We decline to do this.

assessment of a Sheriffs Reimbursement Fee."[10]  Shepard is incorrect.  Both the current and 2018

version of Article 102.011 of the Texas Code of Criminal Procedure, titled "Reimbursement Fees

for Services of Peace Officers," authorize sheriff reimbursement fees.  TEX. CODE CRIM. PROC.

ANN. art. 102.011 (Supp.); *see* Act of May 13, 2009, 81st Leg., R.S., ch. 87, § 6.008, 2009 Tex.

Gen. Laws 208, 231 (effective Sept. 1, 2009).  As a result, we overrule Shepard's complaint

about this fee.

This Court has the authority to modify incorrect judgments when it has the information

necessary to do so.  *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex.

Crim. App. 1993); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.).

In accordance with our findings, we sustain Shepard's last point of error and modify the trial

court's bill of costs as follows:

| STATE CONSOLIDATED COURT COST-2020 | 133.00 |
|---|---|
| LOCAL FEES: | |
|     CLERKS FEE 2020 | 40.00 |
|     COUNTY RECORDS MANG & PRESER FD2020 | 25.00 |
|     COUNTY JURY FUND-2020 | 4.00 |
|     COURTHOUSE SECURITY FUND | 5.00 |
|     C & D COURT TECH FUND-2020 | 4.00 |
|     COUNTY SPECIALITY COURT ACCT-2020 | 0.00 |
| TIME PAYMENT REIMBURSEMENT FEE-202011 | 0.00 |
| SHERIFFS REIMBURSEMENT FEE -2020 | 105.00 |
|     TOTAL COST OF CAUSE | 316.00 |

---

[10]Shepard makes no argument that the record was not sufficient to support the amount of sheriff fees imposed. Nevertheless, the State has painstakingly included record reference citations supporting the amount assessed by the bill of costs.

[11]The time payment reimbursement fee is struck without prejudice.

22

We also modify the trial court's judgment to reflect that the amount owed for courts costs is $316.00 instead of $562.00.

## V.    Conclusion

We modify the trial court's judgment and bill of costs to reflect that the correct amount of court costs is $316.00.  As modified, we affirm the trial court's judgment.

Jeff Rambin
Justice

Date Submitted:    May 2, 2023
Date Decided:       May 19, 2023

Do Not Publish